**Ronald M. GUY**

v.

**MUTUAL OF OMAHA INSURANCE COMPANY.**

Supreme Court of Tennessee, at Jackson.

July 12, 2002.

Herbert E. Gerson and Thomas J. Walsh, Jr., Memphis, Tennessee, for the appellant, Mutual of Omaha Insurance Company.

Donald A. Donati and William B. Ryan, Memphis, Tennessee, for the appellee, Ronald M. Guy.

Douglas S. Johnston, Jr., Nashville, Tennessee, and R. Sadler Bailey, Memphis, Tennessee, for the Amicus Curiae, Tennessee Trial Lawyers Association.

## OPINION

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ., joined.

The principal issue in this case is whether the Tennessee "Whistleblower" Act, Tenn.Code Ann. § 50–1–304, preempts the common law tort of retaliatory discharge when an at-will employee is discharged for reporting illegal or unethical activity. The defendant has appealed a denial of its motion for summary judgment, arguing that section 50–1–304 governs all claims by employees who assert that they have been discharged for whistleblowing activity and, therefore, that the plaintiff must prove

that the *sole* reason for his discharge was his reporting of another agent's illegal conduct. On appeal to this Court, we hold (1) that the statute does not preempt the common law tort, and thus, under the common law, the plaintiff need only demonstrate that his whistleblowing activity was a *substantial factor* motivating his discharge; and (2) that a genuine issue of material fact exists as to whether the plaintiff's whistleblowing activity was a substantial factor in his discharge. Consequently, we affirm the judgment of the Court of Appeals denying summary judgment in this case.

## FACTUAL BACKGROUND

The plaintiff, Ronald Guy, was employed by the defendant, Mutual of Omaha Insurance Company ("Mutual"), on an at-will basis from June 1992 until the date he was discharged in April 1995. Mr. Guy primarily worked as the General Manager of Mutual's Memphis division office. As the General Manager, he was responsible for recruiting and training insurance agents, managing the administrative functions of the Memphis office, and overseeing the agents in the West Tennessee division.

The events leading to Mr. Guy's termination from Mutual began in September 1992 when Mr. Jerry Mack Roberson, a licensed insurance agent operating in Dyer County, Tennessee, applied to become an agent with Mutual. While Mr. Guy was reviewing his application for employment, Roberson was assigned an "agent production number" by Mutual's home office in Omaha, Nebraska. Roberson was also given—from a disputed source—an "agent's kit" containing various materials, including an "Underwriter's Manual" and insurance contact cards. The parties are in dispute as to whether Mutual ever officially hired Roberson as a contracted agent.

Nevertheless, it is undisputed that in December 1992, Roberson made a sales call on Ms. Doris Johnson of Dyersburg, Tennessee, during which he represented himself as an agent of both Mutual and John Hancock Insurance Company. At the end of their meeting, Ms. Johnson decided to purchase an annuity from Mutual. In payment, she gave Roberson a Tupperware stock certificate for 145 shares, as well as checks made payable to Mutual totaling approximately $70,000. In return, Roberson gave Ms. Johnson a John Hancock sales receipt. He then deposited the checks into his personal bank account.

Over the course of a year, Roberson sent checks to Ms. Johnson, which he represented to be "annuity checks." However, they were written on his personal checking account, and one check was returned for insufficient funds. He also kept the stock certificate in his personal possession even though it was made payable to Mutual.

Finally, early in 1994, Roberson contacted Mr. Guy and disclosed to him that he had Ms. Johnson's stock certificate. Roberson forwarded the stock certificate to Mr. Guy, who in turn assigned Houston Jones, another of Mutual's agents, to find out from Ms. Johnson whether she still wanted the stock to be sold and the proceeds invested with Mutual. When Ms. Johnson met with Mr. Jones, she informed him of the "annuity" she had purchased from Roberson, and she showed Mr. Jones the John Hancock receipt that he had given to her. She also told him that one of the annuity checks Roberson sent to her had "bounced." Mr. Jones suspected possible theft and reported Roberson's conduct to Mr. Guy.

When Mr. Guy learned that Roberson possibly misappropriated some of Ms. Johnson's money, he reported the incident to the Tennessee Department of Com-

merce and Insurance. He also believed that John Hancock could suffer sanctions as a result of the improper conduct by Roberson, one of its contracted agents. Consequently, Mr. Guy contacted the managing director at John Hancock and informed him of the situation. However, because Mr. Guy allegedly had no knowledge that Roberson had represented himself as a Mutual agent, he did not believe that Mutual was in any way involved in the fraud perpetrated on Ms. Johnson. He therefore failed to report the incident to anyone at Mutual until almost eight months later when he first became aware of Mutual's potential involvement in this situation. On October 13, 1994, he reported it to Mutual's law division.

On November 4, 1994, Mr. Guy received a positive performance evaluation and an increase in his salary. Several days later, on November 17, 1994, Mutual received a letter from the Tennessee Department of Commerce and Insurance. The Department explained that because Mutual assigned to Roberson an agent production number and supplied him with materials normally given to all agents of the company, Mutual allowed Roberson to represent himself as a Mutual agent. Accordingly, the Department required Mutual to reimburse Ms. Johnson $67,147.83 as a result of the money that Roberson had misappropriated. On December 16, 1994, Mutual agreed to make restitution to Ms. Johnson and, after further clarification of her total monetary losses, ultimately reimbursed her $63,781.72. Four days later, Mutual reduced Mr. Guy's salary by half and reduced his bonus income by 25% in order to offset the Memphis office's losses from the previous year.

Meanwhile, in late 1994, one of Mr. Guy's female agents had complained to him that she had been sexually harassed by the Memphis District Sales Manager, who was under Mr. Guy's supervision. Mr. Guy reported her complaint to his supervisor, and an investigation ensued. On January 13, 1995, Mr. Guy received a letter marked "Personal and Confidential" from the Human Resources Department informing him that the investigation had been completed and that no action would be taken. As a follow-up measure, Mr. Guy was instructed to distribute copies of Mutual's policy on sexual harassment to the employees and agents of his division. However, for some inexplicable reason, the letter itself was also distributed to the personnel in the Memphis division, which included the agent who made the complaint. After receiving the letter, the agent became upset, approached Mr. Guy, and told him that she "felt threatened." He responded that he "didn't know what she expected." On January 26, 1995, the agent reported this incident and her conversation with Mr. Guy to Mutual's home office. However, no disciplinary action was immediately taken.

On February 1, 1995, employees of Mutual and representatives of the Tennessee Department of Commerce and Insurance met with Doris Johnson and wrote an annuity for her in the amount of $63,781.72 to reimburse her for the funds misappropriated by Jerry Mack Roberson. The annuity was delivered to Ms. Johnson on February 13, 1995.

Following the resolution of the Roberson incident, Dave Rooney, Mr. Guy's supervisor, wrote a letter to Mr. Guy on March 1, 1995, expressing "serious concern" over Mr. Guy's "lack of judgment" in (1) his failure to report the Roberson incident to Mutual when he reported it to state authorities, and (2) his mishandling of the sexual harassment complaint. As a result of his "unacceptable performance," Mr. Guy was placed on "written notice," resulting in an additional 20% reduction in his

monthly bonus income. Finally, the letter concluded by admonishing him that continued unacceptable performance could result in termination of his employment.

While Mr. Guy was on written notice, he learned that Greg Paylor, one of Mutual's managers who had previously worked under his supervision, was taking a position in Mutual's Tupelo, Mississippi office. On April 5, 1995, Mr. Guy telephoned Greg's father, Larry Paylor, who was also an acquaintance of Mr. Guy's, to warn him that this move would not be beneficial to Greg's career. At the time of this telephone call, Larry Paylor was employed with Metropolitan Life Insurance Company ("Metlife"), one of Mutual's business competitors. Concerned with his son's career with Mutual, Mr. Paylor reported this conversation to Mutual's human resources department. In his description of the conversation that had transpired, he explained that Mr. Guy made several disparaging remarks about Mutual's business operations, its management, and its decision to transfer Greg Paylor to Tupelo. For example, Mr. Guy told him that Tupelo is the "Kiss of Death" for Mutual managers, because they are given "no benefits, no guarantees, no [clerical support], and [they work on] commission only." Mr. Guy also told him that Greg should either work at Metlife as a manager or request that he be transferred back to Mutual's Memphis office. Mr. Guy warned that until then, Greg "had better keep a look over his shoulder all the time."

On April 19, 1995, Mutual terminated Mr. Guy's employment with its company. Mutual advised Mr. Guy that his termination was based on "unacceptable performance as demonstrated by failure to use judgment consummate with the position of General Manager." It is undisputed that Mutual never cited as a reason for Mr. Guy's discharge his reporting of the illegal conduct of Jerry Mack Roberson to the Tennessee Department of Commerce and Insurance.

One month after his termination, Mr. Guy filed suit against Mutual alleging a common law cause of action for retaliatory discharge in violation of the public policy of the State of Tennessee. In support of his allegations, Mr. Guy asserted that before the Roberson incident was made known to Mutual, he received positive performance evaluations and an increase in his salary. However, he alleged that once Mutual learned that he reported Roberson's fraudulent conduct to the Department of Commerce and Insurance and that Mutual was being held liable for Roberson's illegal conduct, the company waged a "campaign of retaliation" against him, culminating in his discharge from employment.

On July 22, 1997, Mutual filed a motion for summary judgment arguing that the plaintiff could not establish a cause of action for retaliatory discharge because he could not prove that the *sole* motivation for his discharge was his reporting of Roberson's illegal conduct. Instead, Mutual argued, Mr. Guy's discharge resulted from his "critical lack of judgment commensurate with his position as General Manager," as evidenced by three primary incidents: his poor handling of the sexual harassment claim; his failure to immediately notify Mutual of Roberson's fraudulent conduct; and his telephone conversation with Larry Paylor.

The trial court denied the defendant's motion without stating any reason to support its decision. Thereafter, Mutual requested permission to seek interlocutory review of the trial court's denial of the motion for summary judgment, Tenn. R.App. P. 9, which was granted. On appeal, the Court of Appeals first held that common law whistleblower claims have

been preempted by the Tennessee Whistleblower statute, Tenn.Code Ann. § 50–1–304. However, the court also held that Mr. Guy stated a common law claim for retaliatory discharge in violation of public policy, evidenced by Tennessee Code Annotated section 56–6–155 a public welfare statute intended to protect consumers from unscrupulous acts by insurance agents. The intermediate court concluded that there was "barely enough evidence" for a trier of fact to find that a substantial factor in Mutual's decision to terminate Mr. Guy was his reporting of Roberson's fraud to the Department of Commerce and Insurance, and it affirmed the trial court's denial of Mutual's motion for summary judgment.

Thereafter, we granted this appeal to consider whether the "Whistleblower" statute, Tenn.Code Ann. § 50–1–304, preempts the common law cause of action for retaliatory discharge when an employee is discharged for reporting illegal or unethical activity. For the reasons that follow, we hold that section 50–1–304 is cumulative to, and does not preempt, the common law tort; moreover, based on our *de novo* review of the record, we affirm the judgment of the Court of Appeals denying the defendant's motion for summary judgment.

## STANDARD OF REVIEW

The standard of review of a summary judgment determination is *de novo* without any presumption of correctness accorded the trial court's judgment. *See McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 894 (Tenn.1996); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995). Our only task in deciding a motion for summary judgment is to determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn.1993).

Where, as here, the claim is one alleging retaliatory discharge and the essential factor to be determined is the employer's motivation, direct evidence of that motivation is rarely within the plaintiff's possession. *See, e.g., Mason v. Seaton*, 942 S.W.2d 470, 474 (Tenn.1997). Consequently, the reviewing court must make a determination of whether the "proffered admissible evidence shows circumstances that would be sufficient to permit a rational trier of fact to infer a [retaliatory] motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn." *Id.* at 473 (citations omitted). The evidence of causation must be viewed in a light most favorable to the nonmoving party and all reasonable inferences must be made in that party's favor. *Id.; Byrd*, 847 S.W.2d at 215. The burden of proof rests upon the plaintiff to prove a causal relationship between the plaintiff's whistleblowing activity and the termination of employment. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558–59 (Tenn.1993). If the plaintiff is able to demonstrate this causal link, the employer then bears the burden of showing a "legitimate, non-pretextual reason for the employee's discharge." *Id.* at 559. Summary judgment should be granted only when the facts and inferences drawn from those facts permit a reasonable person to reach only one conclusion. *Carvell*, 900 S.W.2d at 26.

## THE RELATIONSHIP BETWEEN THE COMMON LAW TORT OF RETALIATORY DISCHARGE AND THE "WHISTLEBLOWER" ACT, TENN. CODE ANN. § 50–1–304

Tennessee has long adhered to the common law employment-at-will doc-

trine, which provides that an employment contract for an indefinite term is terminable at the will of either the employer or the employee for any cause or for no cause. *See, e.g., Payne v. Western & Atl. R.R. Co.,* 81 Tenn. 507, 517 (1884), *overruled on other grounds by Hutton v. Watters,* 132 Tenn. 527, 544, 179 S.W. 134, 138 (1915); *Chism v. Mid–South Milling Co.,* 762 S.W.2d 552, 555 (Tenn.1988). This jurisdiction has also recognized, however, that the traditional at-will rule is not absolute; restrictions have been imposed upon the right of an employer to terminate an employee when the employee is discharged in contravention of well-defined and established public policy. *Chism,* 762 S.W.2d at 556; *see also, e.g., Clanton v. Cain–Sloan Co.,* 677 S.W.2d 441, 444–45 (Tenn.1984). The essence of the public policy exception is that an employee may claim damages for retaliatory discharge when the motivating factor for the discharge violates a clear public policy "evidenced by an unambiguous constitutional, statutory or regulatory provision." *Chism,* 762 S.W.2d at 556. Indeed, in *Chism,* this Court first recognized as a cognizable cause of action a plaintiff's claim for retaliatory discharge when the at-will plaintiff-employee is discharged for refusing to remain silent about illegal activities. *Id.* at 557. The plaintiff in such an action must demonstrate that the employer's violation was a *"substantial factor* in the employee's discharge." *Id.* (emphasis added); *see also Anderson,* 857 S.W.2d at 558 (overruling implicitly *Watson v. Cleveland Chair Co.,* 789 S.W.2d 538, 544 (Tenn.1989), which recognized a cause of action for retaliatory discharge when an at-will employee is terminated *solely* for refusing to remain silent about illegal activities).

In 1990, just two years after our decision in *Chism,* the Tennessee Public Protection Act, also known as the Tennessee "Whistleblower" Act, was enacted to protect employees from being discharged in retaliation for "blowing the whistle" on infractions of rules, regulations, or the law pertaining to the health, safety, and general welfare of the public. The Act provides, in pertinent part,

(a) No employee shall be discharged or terminated *solely* for refusing to participate in, or for refusing to remain silent about, illegal activities.

. . . .

(c) As used in this section, "illegal activities" means activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare.

(d) Any employee terminated in violation of subsection (a) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn.Code Ann. § 50–1–304 (emphasis added).

■ Mutual argues that when the General Assembly enacted the Tennessee Whistleblower Act, it codified the common law cause of action for retaliatory discharge when an at-will employee is discharged for reporting illegal or unethical activity. Under the statute, the plaintiff must demonstrate an exclusive causal relationship between his whistleblowing activity and his subsequent discharge. Mr. Guy argues, on the other hand, that the statutory and common law causes of action are cumulative. He does not assert that the statute is applicable in his case,[1] but ar-

---

**1.** Mr. Guy never contends that his whistleblowing activity was the sole reason motivating his discharge from employment. More- over, he argues that the statute applies only when the employee is discharged for reporting the *employer* 's illegal or unethical activity

gues instead that he may obtain relief under the common law provided that he can demonstrate that his whistleblowing activity was a substantial factor in Mutual's decision to terminate his employment. Consequently, we must determine whether the General Assembly intended to abrogate the common law tort when it enacted section 50–1–304.

■■■ Our primary task in construing a statute is to give effect to the intent and purpose of the General Assembly "without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993). Consequently, we ascertain legislative intent by examining the "natural and ordinary meaning of the language used, without a forced or subtle construction that would limit or extend the meaning of the language." *Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn.2000). When construing statutes, courts must presume that the legislature has knowledge of the state of the law at the time it passes legislation. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 899 (Tenn.1992); *see also Owens v. State*, 908 S.W.2d 923, 926 (Tenn.1995). "[I]f a statute creates a new right and prescribes a remedy for its enforcement, then the prescribed remedy is exclusive." *Hodges*, 833 S.W.2d at 899 (citing *Turner v. Harris*, 198 Tenn. 654, 664, 281 S.W.2d 661, 665 (1955)). However, where a common law right exists and a statutory remedy is subsequently created, the statutory remedy is cumulative "absent language showing that [it is] intended to be exclusive." *Leach v. Rich*, 138 Tenn. 94, 105, 196 S.W.

138, 140 (1917); *see also Hodges*, 833 S.W.2d at 899.

■■■ After carefully reviewing the Whistleblower Act to determine whether its remedies are intended to be exclusive, we note that on its face, the clear and plain language of the text contains no such indication of exclusivity. While the General Assembly possesses the authority to abrogate the common law by statute, *see Lavin v. Jordon*, 16 S.W.3d 362, 368 (Tenn.2000), the " 'rules of the common law are not repealed by implication, and if a statute does not include and cover such a case, it leaves the law as it was before its enactment.' " *Id.* (citations omitted). Consequently, as we reasoned in *Hodges*,

> [g]iven that our recognition in *Clanton* of a common law tort action for retaliatory discharge predated the [1990 Whistleblower Act], that the Legislature is presumed aware of this prior recognition, and that the remedies subsequently provided by the [Act] are not expressly stated to be exclusive, then the statutory remedies must be considered cumulative.

833 S.W.2d at 899; *see also Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 825 (Tenn.1994) (upholding a common law action for retaliatory discharge in addition to the remedies provided under section 50–1–304). Moreover, our decisions in *Hodges* and *Ozark Motor Lines* were written well after the enactment of section 50–1–304. Clearly, if the legislature had wanted to foreclose a common law cause of action, it had more than ample opportunity to do so; indeed, it could have done so recently

---

and not, as in this case, that of a third person. We disagree with this argument. Nowhere in the plain language of the statute is it specified that the *employer* must have committed the illegal activities about which the plaintiff reported. Indeed, to so limit the scope of the statute would frustrate the statute's purpose

to protect "actions which enhance the enforcement of our laws or expose unsafe conditions, or otherwise serve some singularly public purpose, [that] inure to the benefit of the public." *Wagner v. City of Globe*, 150 Ariz. 82, 722 P.2d 250, 257 (1986).

when, in 2000, it amended the statute to allow successful plaintiffs to recover attorney fees and costs.[2]

In addition, close examination of the statute reveals key distinctions from the common law tort, further indicating the cumulative, rather than the preemptive, nature of the statutory remedy. As the parties have correctly noted, section 50–1–304 increases the burden of proof to require the plaintiff to demonstrate that his whistleblowing behavior was the *sole* reason for his termination, in contrast with the "substantial factor" requirement of the common law. The statute also extends protection to *public* employees, which is a significant departure from the common law. *See, e.g., Williams v. Williamson County Bd. of Educ.*, 890 S.W.2d 788, 790 (Tenn.Ct.App.1994) (stating that sovereign immunity is not removed for a retaliatory discharge claim (citing *Montgomery v. Mayor of Covington*, 778 S.W.2d 444, 445 (Tenn.Ct.App.1988))). Clearly, the General Assembly has recognized the importance of encouraging *all* employees—both public and private—to report infractions of those laws and regulations "intended to protect the public health, safety or welfare." Presumably, to alleviate the burden of damages assessed governmental enti-

ties, the legislature has imposed upon the plaintiff a greater burden to demonstrate that the whistleblowing activity was the *sole* reason for the discharge.[3]

Accordingly, our review of the Whistleblower Act reveals no evidence that the legislature intended to abrogate a common law cause of action. Consequently, we hold that section 50–1–304 is cumulative to, and does not preempt, the common law tort remedy for retaliatory discharge claims where the employee was discharged for reporting illegal or unethical conduct. As a result, the common law tort remains available to the plaintiff.

## THE PUBLIC POLICY INTEREST OF PROTECTING CONSUMERS FROM INSURANCE FRAUD

■■■■■ The question remains, however, whether the plaintiff has asserted a "well defined and established" public policy as the basis for his retaliatory discharge claim.[4] Mr. Guy relies on the legislature's enactment of the Tennessee Insurance Law as evidence of a clear expression of the public policy in this state with respect to protecting the public from the fraudulent activity of insurance agents. Specifically, he relies upon section 56–6–155,

---

**2.** *See* Tenn.Code Ann. § 50–1–304(d)(2) (2000) ("Any employee terminated in violation of subsection (a) solely for refusing to participate in, or for refusing to remain silent about, illegal activities who prevails in a cause of action against an employer for retaliatory discharge for such actions shall be entitled to recover reasonable attorney fees and costs.").

**3.** The statute permits a successful plaintiff to recover "damages to which the employee may be entitled." Tenn.Code Ann. § 50–1–304(d)(1). Presumably, a plaintiff asserting a statutory cause of action against a private employer may be able to recover punitive damages, *see Clanton*, 677 S.W.2d at 445. However, we need not address whether a

governmental entity, normally not subject to punitive damages under the Governmental Tort Liability Act, Tenn.Code Ann. § 29–20–101 et seq., *see also Tipton County Bd. of Educ. v. Dennis*, 561 S.W.2d 148 (Tenn.1978), would be liable for punitive damages under section 50–1–304.

**4.** To be clear, under both the statute and the common law, the plaintiff must assert that his or her whistleblowing activity "serves a public purpose [that] should be protected. So long as employees' actions are not merely private or proprietary, but instead *seek to further the public good,* the decision to expose illegal or unsafe practices should be encouraged." *Wagner,* 722 P.2d at 257 (emphasis added).

which lists the various grounds for which the Insurance Commissioner can suspend or revoke an agent's license, as well as assess an agent with a civil penalty. In response, Mutual argues that because there is no statutory duty in this provision requiring an agent to report unlawful activity by other agents, the plaintiff has not demonstrated that Mutual violated a "clear public policy evidenced by an unambiguous constitutional, statutory or regulatory provision." Therefore, Mutual alleges, the plaintiff has failed to establish the "clear public policy" necessary to form the basis of a retaliatory discharge claim.

 Our inquiry, however, is not limited to whether a particular law or regulation has been violated; rather, our inquiry focuses on whether some "important public policy interest embodied in the law has been furthered by the whistleblowing activity." *Gutierrez v. Sundancer Indian Jewelry*, 117 N.M. 41, 868 P.2d 1266, 1273 (1993) (citations omitted). Indeed, in an early decision by this Court, we recognized the public policy interest behind encouraging "insurance companies and others interested" to bring to the attention of the Insurance Commissioner the derelictions of agents:

> Many painful cases come before the courts where ... people have given up their scanty earnings without profit to themselves or to their beneficiaries because of unauthorized misrepresentations by unscrupulous agents as to the terms and effect of insurance contracts such agents were writing. The interest of the people as a whole ... requires a supervision of agents authorized to solicit and write life insurance. Only [persons] of good character should be permitted to pursue such a calling and dishonest and unreliable [persons] should be debarred from such a calling.

*Independent Life Ins. Co. v. Rodgers*, 165 Tenn. 447, 458, 55 S.W.2d 767, 770 (1933). Such a clear declaration of public policy warrants our holding that an agent of an insurance company, who seeks to ensure compliance with the rules and regulations governing insurance agents, cannot be discharged without being furnished a cause of action for retaliatory discharge.

## SUMMARY JUDGMENT DENIED

 Having determined that section 50-1-304 does not preempt the common law tort for retaliatory discharge when an employee is fired for reporting illegal conduct, and having determined that there is a clear public policy favoring reporting fraudulent activity by insurance agents, we must now determine whether Mutual is nevertheless entitled to summary judgment.

Our *de novo* review of the record, in the light most favorable to the plaintiff, indicates that Mr. Guy received an excellent performance evaluation on November 4, 1994, and was offered a "Special Compensation Arrangement," which included a 100% increase in his monthly salary. Thirteen days later, the Tennessee Department of Commerce and Insurance informed Mutual of its obligation to reimburse Ms. Johnson for her financial loss as a result of Jerry Roberson's fraudulent conduct. On December 16, 1994, Mutual's legal department responded by letter to the department's request for reimbursement and accepted responsibility for a portion of Ms. Johnson's loss. A copy of this letter was forwarded to Mr. Guy's supervisor. Four days later, Mr. Guy was notified that his monthly salary would be cut in half.

On January 26, 1995, Mutual was notified of Mr. Guy's alleged lack of judgment with respect to the sexual harassment complaint. However, no disciplinary ac-

tion was taken until shortly after the Roberson incident was resolved, when, on March 1, 1995, Mr. Guy was placed on "written notice." He was terminated on April 19, 1995. Although his termination occurred shortly after his conversation with Larry Paylor, the record reflects that Mutual did not communicate to Mr. Guy that this incident was one of the reasons for his discharge.

Mutual argues in response that one of the reasons motivating its decision to terminate Mr. Guy was not the fact that he reported Roberson's fraud to the Department of Commerce and Insurance, but that he *failed to immediately notify Mutual that he had done so.* Mr. Guy's failure to immediately inform his superiors of Roberson's actions caused an "unnecessary delay ... in [Mutual's] ability to provide restitution to Ms. Johnson." Although this may be true, we are not permitted, on a review of a denial of summary judgment, to draw inferences in favor of the moving party. Accordingly, we affirm the judgment of the Court of Appeals and likewise conclude that there is "barely enough evidence" to permit a rational trier of fact to infer a retaliatory motive as a substantial factor in Mr. Guy's discharge.

## CONCLUSION

In sum, we hold that section 50–1–304 does not abrogate, but is cumulative to, the common law cause of action for retaliatory discharge when the employee is discharged for reporting illegal or unethical conduct. We also hold that Mr. Guy asserted a well-defined and established public policy as the basis for his retaliatory discharge claim. Finally, we hold that there is a genuine issue of material fact with respect to whether Mr. Guy's whistle-blowing activity was a substantial factor in Mutual's decision to discharge him from employment. Based on our *de novo* re-

view of the record, we conclude that summary judgment was properly denied in this case, and we affirm the judgment of the Court of Appeals.

Costs of this appeal shall be assessed against the defendant, Mutual of Omaha Insurance Company.