# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 11, 2007 Session

## BRIDGESTONE/FIRESTONE, INC. v. WILLIAM J. ORR

**A Direct Appeal from the Chancery Court for Rutherford County**
**No. 01-2653CV     The Honorable Robert E. Corlew, III, Chancellor**

---

### No. M2006-2638-COA-R3-CV - Filed January 7, 2008

---

This is an appeal from the grant of summary judgment dismissing Appellant's counterclaim for statutory retaliatory discharge against his employer, the Appellee herein. Finding that the material facts of this case are undisputed and that Appellant failed to show that he refused to participate in or to remain silent about any alleged illegal activity, and/or to prove an exclusive causal link between his alleged refusal to participate in or to remain silent about alleged illegal activities and his termination, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, J. delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S. and JEFFREY F. STEWART, SP.J., joined.

William Kennerly Burger of Murfreesboro, Tennessee for Appellant, William J. Orr

Robert E. Boston, Charley H. Williamson of Nashville, Tennessee for Appellee, Bridgestone/Firestone, Inc.

## OPINION

William J. Orr ("Appellant") was a senior lab technician at Bridgestone/Firestone, Inc.'s ("BF," or "Appellee") satellite Technical Center operation in LaVergne, Tennessee. The Technical Center in LaVergne is part of BF's Production Development Division, which is a group of engineers, chemists, compounders, and technical advisors that design and develop tires for sale in North and South America. The LaVergne Technical Center tests and analyzes truck- bus, radial tires ("TBR") and has no responsibility for BF's other tire products.

Mr. Orr's primary job function was to assist in analyzing developmental, current production, and competitor TBR tires by cutting them into display sections and then accumulating the designated data requested and directed by BF's engineers, physicists, chemists, and advisors. Mr. Orr did not perform design analysis of the TBR tires, nor did he evaluate and analyze TBR tire raw materials,

components, compounds, or formulas. Rather, BF's engineers, physicists, chemists, designers, and advisors depended on the cut sections and data that Mr. Orr, and other lab technicians, provided so that they could make the ultimate decisions about the TBR tires.

As part of its tire manufacturing operations in LaVergne, BF occasionally sells truck-bus, radial tire casings to vendors to retread.[1] During the Spring and Summer of 2000, Joel Blair, owner of Interstate Tire, purchased approximately 666 tire casings from BF, for a total amount of $34,190. In July 2000, Mr. Blair made a $2,900 payment to BF, leaving a balance of $31,290 due.

In the past, Mr. Orr had facilitated sales of BF tire casings to Mr. Blair and others. Consequently, his supervisor, Larry Elkins, assigned Mr. Orr the task of collecting the balance due from Mr. Blair. In the Fall of 2000, Mr. Orr reported to Mr. Elkins that his collection efforts with Mr. Blair had been unsuccessful. John Vasser, one of Mr. Orr's co-workers, reported to Mr. Elkins that Mr. Blair had told Mr. Vasser that Mr. Orr and Mr. Blair had devised a scheme whereby Mr. Orr would allow Mr. Blair to report useable purchased tire casings as unusable. Mr. Blair could then sell those useable casings and split the profits with Mr. Orr. Mr. Vasser also reported that Mr. Orr had told Mr. Blair that he would stop pressing Mr. Blair for the amount he owed, if Mr. Blair would pay Mr. Orr some money.

Mr. Elkins reported this information to his supervisor, Susumu Sato. Mr. Elkins suggested that BF discontinue selling tire casings to Mr. Blair, and that the company reassign Mr. Orr to a different job. Mr. Elkins was also to contact Mr. Blair concerning the balance owed to BF. Following a call on January 3, 2001, Mr. Elkins reported that Mr. Blair told him that Mr. Blair had already paid Mr. Orr a total of $7,000 in cash against the amount owed. After informing Mr. Orr about what Mr. Blair had said, Mr. Elkins notified Mr. Sato and Mr. Tim Riedinger, Controller for the Technical Center. Mr. Riedinger assigned two of BF's Senior Corporate Auditors, Mike Gantt and Kendall Thompson, to investigate Mr. Blair's allegations. During the week of January 15, 2001, Messrs. Thompson and Gantt interviewed Mr. Blair. At this interview, Mr. Blair stated that he had paid Mr. Orr $4,000 in June of 2000 and $3,000 in September 2000, for a total of $7,000. Mr. Blair indicated that his wife, Angel, was present at one of the two meetings between Mr. Blair and Mr. Orr. Mr. Blair also stated that his cousin, Van Bush, had been present at the other meeting. The BF auditors interviewed Mrs. Blair. She confirmed that she had negotiated checks to obtain the cash that was used to pay Mr. Orr, and that she had seen Mr. Blair give Mr. Orr a cash payment for tire casings. The auditors then interviewed Mr. Bush, who confirmed that he too had seen Mr. Blair give Mr. Orr a cash payment for casings. Messrs. Gantt and Thompson prepared written statements following these interviews.

On January 19, 2001, Messrs. Gantt and Thompson interviewed Mr. Orr. Mr. Orr denied that he had received cash from Mr. Blair, but confirmed that he had met with Mr. Blair during the Summer of 2000. During his interview, Mr. Orr allegedly made suspicious comments. Specifically, he answered "Yes," when asked whether he "thought it was right to do something wrong for the right reason." Mr. Orr also allegedly remarked that "$7,000 wasn't much money to fire someone over."

---

[1] A tire casing is the stripped carcass of a tire that vendors purchase in order to retread and resell.

Messrs. Thompson and Gantt obtained a written statement from Mr. Orr. Following the interview, Mr. Orr was suspended, with pay, pending the outcome of the investigation.

Mike Kostko, Manager of Human Resources for BF's Product Development Division, reviewed the auditor's notes. Mr. Kostko concluded that there was evidence that Mr. Orr had misappropriated funds. Mr. Kostko then made the decision to terminate Mr. Orr's employment. On January 30, 2001, Mr. Orr met with Mr. Elkins and Dan Leonard, the LaVergne facility's Human Resources Manager of Salaried Employees. Mr. Leonard informed Mr. Orr that, based upon the internal investigation, BF had lost confidence in him, and that the company was terminating Mr. Orr's employment based upon evidence that he had misappropriated company funds.

On May 21, 2001, BF filed a Complaint against Mr. Orr, Joel Blair, and Joel Blair d/b/a Interstate Tire in the Chancery Court for Rutherford County. In its Complaint, BF alleged individual and collective claims for breach of contract, promissory estoppel, breach of duty of good faith and fair dealing, fraud, conspiracy, unjust enrichment, conversion, inducement, and breach of duty of loyalty. By Order of February 6, 2002, BF was awarded a default judgment against Mr. Blair and Interstate Tire; however, BF's claims against Mr. Orr remained.

On August 31, 2001, Mr. Orr filed an Answer and Counterclaim. In his Counterclaim, Mr. Orr asserts that BF retaliated against him in violation of T.C.A. §50-1-304. After extensive discovery, on October 11, 2005, BF moved for summary judgment on Mr. Orr's Counterclaim. Specifically, BF asserts that Mr. Orr is not entitled to relief because he cannot establish a *prima facie* case of retaliation. Specifically, BF contends that Mr. Orr has failed to: (1) establish that he refused to participate in or remain silent about any alleged illegal activity, (2) prove an exclusive causal link between his alleged refusal to participate in or to remain silent about alleged illegal activities and his termination, and/or (3) has offered no evidence of pretext. On October 28, 2005, Mr. Orr filed a response to the motion for summary judgment, and BF replied on November 4, 2005.

A hearing was held on November 7, 2005. At a conference on December 7, 2005, the trial court dismissed Mr. Orr's Counterclaim, and set out its specific ruling in an opinion letter. This letter was expressly incorporated into the trial court's Order and Final Judgment, dismissing Mr. Orr's Counterclaim, which Order was filed on November 3, 2006. Mr. Orr filed a timely notice of appeal. However, upon review of the record on appeal, this Court concluded that the Order appealed was not a final order because BF's claims against Mr. Orr, *supra*, had not been adjudicated. Consequently, this Court entered an Order giving Mr. Orr thirty days to supplement the record with a final order. Mr. Orr complied with that Order and the record was supplemented with the trial court's order of November 27, 2007, which includes the Tenn. R. Civ. P. 54.02 language and, consequently, constitutes an order appealable as of right. *See* Tenn. R. App. P. 3.

In his appeal, Mr. Orr raises one issue for review as stated in his brief: "Do genuine issues of material fact preclude the granting of summary judgment dismissal of the whistle blower Counterclaim asserted by Appellant Orr?"

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter

of law. *See* Tenn. R. Civ. P. 56.04. The moving party for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997). On a motion for summary judgment, the court must take the strongest legitimate view of evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery material, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id*. at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995). Because only questions of law are involved, there is no presumption of correctness regarding a trial court's grant or denial of summary judgment. *See Bain*, 926 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn.1997).

Tennessee adheres to the common-law doctrine of "at-will" employment, which provides that employment contracts of indefinite duration are terminable at the will of employer or employee for any or no cause. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534-35 (Tenn.2002). However, a narrow exception to this doctrine restricts an employer's right to terminate an employee when such an action violates a clearly established public policy. *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 555-56 (Tenn.1988). In addition to a common-law action for retaliatory discharge (which Mr. Orr does not raise), the Tennessee General Assembly has adopted a statutory cause of action under the Tennessee Public Protection Act, commonly referred to as the "Whistleblower Act." T.C.A. §50-1-304(a) (2005) provides that no employee shall be discharged solely for refusing to participate in or to remain silent about illegal activities, T.C.A. § 50-1-304(a). "Illegal activities" include state and federal criminal and civil violations, as well as violations of any regulation affecting public health, safety, and welfare. T.C.A. §50-1-304(c). Consequently, in order to prevail on a statutory retaliatory discharge claim, an employee must prove (1) that an at-will employment relationship existed between the employee and the employer, (2) that the employee was discharged, (3) that the employee was discharged for attempting to exercise a statutory or constitutional right, or for any other reason that violates a clear public policy, and (4) that the employee's refusal was the sole reason for his or her discharge from employment. T.C.A. § 50-1-304(a); *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d at 535-37.

On appeal, Mr. Orr asserts, *inter alia*, that his employment was terminated because he did not remain silent concerning his observations of increased tire failures. Mr. Orr contends that these tire failures were the result of BF's internal, cost-cutting program called C-95, which was initiated

in the late 1990s. Mr. Orr contends that these cost-cutting efforts directly led to the 2000 NHTSA recall of BF passenger tires. Although Mr. Orr argues that he was fired because he brought certain tire deficiencies to the attention of his supervisors, the undisputed facts in this record indicate that Mr. Orr was never discouraged from reporting tire anomalies or deficiencies. Rather, the facts indicate that Mr. Orr was encouraged to bring his concerns to his superiors. Furthermore, as set out above, Mr. Orr worked solely with the TBR tires. The 2000 recall involved only passenger vehicle tires. The record shows that Mr. Orr reported his concerns about quality issues only as to the TBR tires. Moreover, when Mr. Orr reported "inside chafer separation" to his superiors, the record shows that he was actually commended for bringing the problem to BF's attention, and that further testing was subsequently performed. Although Mr. Orr asserts that he was told to remain silent about the problems with the tires, the basis of that claim is his attendance at an assembly of BF employees. The record indicates that this assembly, which was conducted by BF's attorneys, was to inform the employees of the current status of the investigation into BF's passenger tires and to suggest that employees avoid terms like "anomaly" or "defect" in discussing those tires. However, there is no indication that Mr. Orr was ever singled out or told to remain silent concerning his findings on TBR tire quality. From the record, it appears that Mr. Orr was, in fact, encouraged to bring these concerns to his supervisors, and that his complaints were heard and investigated by BF.

In addition, Mr. Orr has not shown that he was fired for reporting any illegal, or protected, activity. In raising his concerns about the TBR tires, Mr. Orr never alleged that BF was engaged in illegal activity. Mr. Orr's reliance upon the C-95 documents to point to illegal activities on the part of BF is untenable. First, the record shows that Mr. Orr was not aware of these documents during the time that he was employed. Furthermore, the C-95 documents concern BF's passenger tires, not the TBR tires that Mr. Orr worked with and about which he registered complaints with his superiors.

Moreover, Mr. Orr fails to show that BF's decision to terminate his employment was based solely upon the fact that he brought quality concerns to his supervisors. Rather, the record shows that Mr. Orr was terminated because he embezzled approximately $7,000 from the company. There is no indication in the record that BF used the incident with Mr. Blair and Interstate Tire as pretext.

For the foregoing reasons, we affirm the Order of the trial court granting summary judgment in favor of BF. Costs of this appeal are assessed against the Appellant, William J. Orr, and his surety.

_____
W. FRANK CRAWFORD, JUDGE