IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 6, 2010 Session

## MYRNA WHEELOCK, ET AL. v. JESSE THOMAS DOERS, M.D., ET AL.

### Appeal from the Circuit Court for Knox County
No. 1-240-08      Dale C. Workman, Judge

### No. E2009-01968-COA-R3-CV - FILED SEPTEMBER 14, 2010

In this appeal, the plaintiffs contend that the trial court erred in granting summary judgment in favor of the defendants.  We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J. and D. MICHAEL SWINEY, J., joined.

Terry G. Vann, Lenoir City, Tennessee, for the appellants, Myrna Wheelock, Lester Wheelock, and Cortney L. Caldell.

F. Michael Fitzpatrick and Rachel P. Hurt, Knoxville, Tennessee, for the appellee, Parkwest Medical Center.

Debra A. Thompson, Knoxville, Tennessee, for the appellees, Jesse Thomas Doers, MD; StatCare Pulmonary Consultants, and StatCare Hospitalist Group.

### OPINION
### I.  BACKGROUND

This appeal arises out of an action for wrongful death brought by Myrna Wheelock ("Wife"), Lester Wheelock ("Son"), and Cortney L. Caldell ("Daughter") (collectively "the Family" or "Plaintiffs") against Jesse Thomas Doers, M.D., Statcare Pulmonary Consultants, Statcare Hospitalist Group, and Parkwest Medical Center ("Parkwest") (collectively "Defendants").

On May 28, 2007, 78-year-old Gene Wheelock ("Decedent") complained of shortness of breath and was transported from NHC Farragut nursing home to Parkwest's emergency

department.  Upon arrival, Decedent underwent a physical examination and his medical records were reviewed.  Decedent's medical history included a long list of serious medical conditions, including a recent sub-arachnoid (intracranial) hemorrhage.[1]  Further diagnostic tests, including a chest CT, revealed extensive blood clotting in Decedent's lungs which affected the flow of blood to Decedent's left leg.  The scan also revealed indications of congestive heart failure.

Dr. Doers, a pulmonologist, was paged due to the severity of the symptoms revealed by the CT scan.  After reviewing the results of the scan and Decedent's medical history, Dr. Doers determined that Decedent had massive pulmonary emboli (blood clots in the lungs) and that these were most likely caused by Decedent being taken off his blood-thinning medication.  Dr. Doers informed Decedent's family that Decedent could not be put back on his blood-thinning medication due to his recent intracranial hemorrhage and that the best option would be to insert a filter into Decedent's right groin in order to prevent further blood clots.  The Family agreed and Decedent was returned to his room to be prepared for surgery.  Dr. Doers noted that Decedent was "quite tenuous with high risk of mortality" and that the Family was aware of this.  Because of the serious nature of Decedent's condition, Dr. Doers found it necessary to discuss Decedent's desire to have "heroic procedures" done to save his life.  In his notes, Dr. Doers documented his discussion with Decedent regarding the use of heroic procedures:

> Do Not Resuscitate.  I discussed with the patient whether he would want CPR, heart defibrillation, or mechanical ventilation.  He was quite clear that he did not wish this.  I then addressed with the family members in attendance why I did this and whether they concurred, and all expressed their agreement at that time.

This account was transcribed on June 22, 2007, nearly one month after Decedent's death.  Dr. Doers essentially reaffirmed this account in his deposition.  He testified as follows:

> A. . . . I let him know how large this was and how there was a high risk of not surviving.  I then asked him if he had ever thought about whether he would want heroic procedures done to include breathing machine, having his heart shocked, CPR and so forth.
>
> It was then that he actually sat up and said, "No," and waived his hand with kind of a backhand motion.  It was the most animated response that I got out of him during the entire time.

---

[1]Bleeding in the brain.  Decedent had been recovering from a stroke at NHC Farragut.

* * *

Q. . . . [W]hat did [the Family] tell you?

A. Well, he said not to everything and they said, yeah, in fact, he has got a living will. . . . And I said, Well, he has just told us what he wanted, that he did not want anything done -- you know, done.

* * *

A. . . . I always recognize that living wills are valid at the time they are made, but people can change their mind. And he seemed so clear to me that it did not even register that there was any difference between what he stated to me and what his living will stated.

* * *

Q. And is it hospital policy or is it standard in the medical community that this document overrides any provisions of the -- an advanced care directive?

A. Yes. I mean, if it is clearly documented, . . . like I said, things change. If somebody has a – . . . I'll give you an example -- a living will and they are just told that they have widely metastic lung cancer and then they tell the physician, I don't want to have chemotherapy or any heroics done, we wouldn't go to a two-year old living will and say that overrides it.

Decedent's family disputes this account and alleges that Decedent had a living will instructing medical personnel to use heroic efforts in order to sustain his life and that Dr. Doers was aware of this. According to Decedent's daughter-in-law, the following occurred:

4. . . . Dr. Doers asked if Gene Wheelock wanted to be resuscitated, that Gene Wheelock asked what that was, that I explained it involved CPR, and that Gene Wheelock responded "Oh, yes, I want that!"

* * *

6. That I have read Dr. Doer[s'] Deposition . . . stating that Gene Wheelock "sat up and said 'No." and waived his hand with a kind of backhand motion . . . most animated response" when asked if he wanted to receive CPR, and that

-3-

I absolutely and categorically tell you that did not happen, and that statement by Dr. Doers is false.

* * *

At 5:15 p.m. on May 28, Dr. McLean, a radiologist, began the filter procedure, which was concluded at 5:30 p.m. Dr. McLean then ordered that Decedent be on bed rest for two hours post-operation. This was ordered to prevent the formation of a hematoma at the puncture site of the groin.

Sometime after 7:00 p.m., Decedent informed the nurses that he needed to use the restroom. Roger McGee, a certified nurse's assistant ("CNA McGee") entered Decedent's room and assisted him to the bathroom. Plaintiffs assert that they reminded CNA McGee that Decedent was not to be moved until 7:30 p.m. However, a nursing judgment was made that CNA McGee could assist Decedent to the restroom. Upon entering the restroom, CNA McGee realized that Decedent's oxygen hose was not long enough to reach the restroom. CNA McGee removed the oxygen mask, assisted Decedent to the restroom, and left Decedent's room to get a longer oxygen hose. There is some dispute as to what happened after this. Plaintiffs claim CNA McGee returned to find Decedent collapsed on the floor. Plaintiffs assert that CNA McGee then reconnected Decedent's oxygen and returned him to bed. After returning to bed, Decedent stopped breathing.[2]

CNA McGee pressed the code blue button and started CPR. A nurse came into Decedent's room at 7:36 p.m. and ordered CNA McGee to stop CPR due to Dr. Doers' DNR order. Plaintiffs contend that they pleaded with the nurses to continue giving CPR, but the nurses declined to do so pursuant to Dr. Doers' DNR order.[3] Decedent was pronounced dead shortly thereafter.

Plaintiffs, individually and as heirs-at-law of Decedent, brought this wrongful death action against Defendants on May 28, 2008.

In his deposition, Dr. Doers testified to a reasonable degree of medical certainty that: (1) Decedent had only a 10 to 20% chance of surviving the massive pulmonary emboli that

_____

[2]Defendants contend that CNA McGee reconnected Decedent to the oxygen while he was still on the commode. Decedent's daughter-in-law swore in an affidavit the following: "that Gene Wheelock passed out and had to be carried back to bed, and that Gene Wheelock turned blue and [Son] yelled to tell the CNA that Gene Wheelock had trouble breathing."

[3]Son contends that staff should have honored his request for CPR as he was Decedent's attorney-in-fact pursuant to an executed Durable Healthcare Power of Attorney.

were present when he entered Parkwest on May 28, 2007, and more likely than not he would not have survived those pulmonary emboli and would not leave the hospital alive; (2) Decedent would not have survived even if CPR was continued; (3) because of the massive pulmonary emboli, Decedent would have suffered the same result even if a bed pan had been used instead of assisting Decedent to the bathroom; (4) Decedent's death bore no relationship to the fact that Decedent did nor did not remain on bed rest for the full two hours, as ordered by Dr. McLean; and (5) the purpose of the bed rest order was to prevent any bleeding at the puncture site in the groin of the patient where the surgery had been performed; this bed rest order had nothing to do with Decedent's lung/pulmonary problems. Plaintiffs failed to offer expert medical testimony to refute Dr. Doers' testimony.

On May 11, 2009, Defendants filed a motion for summary judgment, asserting that the standard of care was not breached and that the care provided to Decedent did not result in any injuries. At a hearing on that motion on July 24, 2009, the trial court held as follows:

> The Court does not find there is an independent cause of action for Myrna Wheelock, Lester Wheelock and Courtney Wheelock. They have no independent cause of action. This is a cause of action for the services provided to and any injury incurred by Gene Wheelock. If the plaintiff[s are] trying to assert an independent claim for their emotional injury for going through or observing the medical care given or not given to Gene Wheelock, I find there is no independent cause of action for that under the applicable case law related to medical services being provided. It does not follow with the one exemption which our appellate courts have set forth that for other persons other than the patient to sue for any action of a health care provider that otherwise falls within the Medical Malpractice Act that they don't fall in that section. So they have no independent cause of action.
>
> Now, as to Dr. Doers, there is no countervailing valid affidavit to contradict the standard of care for him as a physician. So with that, the Court must find, under the Medical Malpractice Act, that one of the requirements for the plaintiff[s] is to establish a violation of the standard of care. And the Court finds that under the record before me at this point there is no contested issue, that all of his actions were within the standard of care, which is the thing that the plaintiff[s] must prove. So the motion is granted as to the doctor.
>
> As to the question as to whether the doctor's memory of what the patient said about wanting or not wanting certain services, particularly the question of CPR, and the question of whether the doctor's notations on the charts or instructions to the hospital about that, in light of the living will, whether there

is a cause of action for that or not, still the Court finds is a matter under the Medical Malpractice Act.

We have had a great deal of discussion here about medical services and the request of medical care providers as to whether there can be a cause of action for not providing medical services that a health care provider finds are not within those services required to be given under the standard of care, but at this point I don't believe the law of this state allows a patient or others to bring an action against a health care provider for not providing services that, within the standard of care, would not have been provided.

And the classic, the easiest example I can think of it, we talked about something specific in this case, but I think we're going to get away from it, so the issue is clearly identified. A patient walks in and says I want a full-body MRI to find out if I have got cancer anywhere. And a health care provider, it could be one of several different types, under the standard of care is not required and will not order that service because that's not required of the standard of care.

Can that health care provider then be sued for not providing the service requested of them that is available and can be given, but is not necessary under the standard of care? I think the answer at this point is no. And there is a lot of reasons -- you can say no and yes in regard to that question, but I think at present there has been no indication that there is a cause of action for that in Tennessee.

It would create some real interesting questions and effects on the social policies now being discussed about preventative medicine and all those other things if there was ever a definitive statement about all of this as to what services should or should not be provided no matter what the client says or might have. Where do you draw the line? But that's another issue.

Now, because I find no cause of action against Doers and there is no question otherwise other than his medical group, he is merely their agent, the case be dismissed as to the doctors in the group.

As to the medical center, it's a different set of issues because here we do have a responding affidavit. The Court notes that the responding affidavit of the nurse filed by the plaintiff does not describe in particular how she would know the standard of care and about this time other than she has been a practicing

nurse.

But onward from that, the crucial factor I think is, there is no proof that continuing CPR or giving CPR would have changed the end result, which is a critical requirement of the Medical Malpractice Act. That you have got to establish that the health care provider, in this case the nursing services being provided, even though there was, as taking as true everything stated by the plaintiff, a living will saying he wanted CPR, and taking as true the fact that he told the doctor he wanted CPR, there is no proof that the outcome would have been different if he would have suffered any injury.

In fact, the reverse could have been true. He could have been given CPR for some period of time. And when do you stop is the next question. Just because a patient says I want it, does that mean you have to give it and continue giving it to when? But those are the reasons why it is left to the standard of care in the health-care industry, be it the nurses' standard of care or the doctors,' the reason why that's left to that decision.

So with that, the Court finds the case should be dismissed on the motion for summary judgment with attached costs to the plaintiff[s].

Plaintiffs then filed a timely notice of appeal.


## II. ISSUES

We restate the issues raised by Plaintiffs in this appeal as follows:

Whether the trial court erred in granting summary judgment under the facts of this case.


## III. STANDARD OF REVIEW

This case comes on appeal from grant of motions for summary judgment filed by Defendants.

In reviewing a trial court's grant of a motion for summary judgment, this court must determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *Staples v. CBL & Assocs., Inc.,* 15 S.W.3d 83, 88 (Tenn. 2000). Our inquiry involves only a question of law

with no presumption of correctness attached to the lower court's judgment. *Id.* Under Tenn. R. Civ. P. 56.04, "[s]ummary judgment is appropriate when the moving party can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Hannan v. Alltel Publ'g Co.,* 270 S.W.3d 1, 5 (Tenn. 2008) (citing Tenn. R. Civ. P. 56.04; *Byrd v. Hall,* 847 S.W.2d 208, 214 (Tenn. 1993)). In Tennessee, the moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either

> (1) affirmatively negate an essential element of the nonmoving party's claim; or
>
> (2) show that the nonmoving party cannot prove an essential element of the claim at trial.

*Hannan,* 270 S.W.3d at 8-9. A "conclusory assertion" is not enough to shift the burden. *Id.* at 5 (quoting *Byrd,* 847 S.W.2d at 215). It is also not enough for the moving party to "cast doubt on a party's ability to prove an element at trial." *Hannan,* 270 S.W.3d at 8.

If the moving party presents a properly supported summary judgment motion, the burden then shifts to the nonmoving party to show that a genuine issue of material fact exists. *Byrd*, 847 S.W.2d at 215. We review the trial court's grant of summary judgment de novo with no presumption of correctness. *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 534 (Tenn. 2002). When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Staples*, 15 S.W.3d at 89. Summary judgment should be awarded only when a reasonable person could reach only one conclusion based on the facts and inferences drawn from those facts. *Id.*

## IV. ANALYSIS

The trial court concluded that Plaintiffs' complaint sounded in medical malpractice. In distinguishing between medical malpractice and general negligence, it should be noted that not all cases involving health or medical entities sound in medical malpractice. *Gunter v. Lab Corp. of Am.,* 121 S.W.3d 636, 640 (Tenn. 2003). In *Gunter*, the Supreme Court embraced the New York Court of Appeal's test for determining whether a claim sounds in medical malpractice or general negligence:

> [A] claim sounds in medical malpractice when the challenged conduct

"constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician." By contrast, when "the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the hospital's failure in fulfilling a different duty," the claim sounds in negligence.

*Id.* at 640-41 (quoting *Weiner v. Lenox Hill Hosp.*, 673 N.E.2d 2d 914, 916 (N.Y. 1996) (quoting *Bleiler v. Bodnar*, 479 N.E.2d 230, 234-35 (N.Y. 1985))). From this analysis, the Tennessee Supreme Court developed the "substantial relationship test," which holds:

[W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

*Gunter*, 121 S.W.3d at 641. The Court has held that "the medical malpractice statute may extend to acts of non-physicians, such as nurses, when they are involved in the medical treatment of a patient. *Id.* at 640. As noted by Defendants, this court in *Conley v. Life Care Ctrs. of Am., Inc.*, 236 S.W.3d 713, 729 (Tenn. Ct. App. 2007), has observed that to distinguish between common law negligence and medical malpractice, courts must consider "whether the decision, act, or omission complained of required the assessment of a patient's medical condition and whether the decision, act, or omission required a decision based upon medical science, specialized training or skill."

Plaintiffs' complaints about the post-surgical care of Decedent by the nursing staff, primarily the decision to move him and in failing to continue the administration of CPR, address matters that required decisions by the nursing staff involving specialized skill and training. *See McBee v. HCA Health Servs. of Tenn., Inc.*, No. M2000-00271-COA-R3-CV, 2000 WL 1533000, at *3 (Tenn. Ct. App. M.S., Oct. 18, 2000). These allegations, therefore, sound in medical malpractice and would be matters under the Tennessee Medical Malpractice Act, Tenn. Code Ann. § 29-26-115, et seq. (Supp. 2009). The Act sets out three elements that must be proved in a malpractice case:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a) (Supp. 2009); *see also Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006).

The trial court found that Plaintiffs did not satisfy the requirements of the Medical Malpractice Act. In particular, the court determined that Defendants had affirmatively negated the third element -- that Plaintiffs had not demonstrated a genuine issue of material fact regarding causation, i.e., expert medical testimony that Defendants' actions proximately caused Decedent's death.

To avoid summary judgment, Plaintiffs were required to produce testimony to create a genuine issue of material fact that the results, within a reasonable degree of medical certainty, would have been different if Decedent had not been moved or if CPR had been continued. Under the facts of this case, only a medical expert could carry Plaintiffs' burden of production to demonstrate causation. Plaintiffs provided an affidavit from Cheryl Williamson, R.N. Her affidavit noted only that "patient Gene Wheelock might have lived longer if given the opportunity."

"Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty." *Bishop v. Smith & Nephew Richards, Inc.*, No. 02A01-9405-CV-00108, 1995 WL 99222, at *5 (Tenn. Ct. App. W.S., Mar. 10, 1995). We also note that because a nurse is prohibited under Tenn. Code Ann. § 63-7-103(b) from making a medical diagnosis, a nurse is likewise prohibited from testifying as to medical causation. *See Hinson v. Claiborne & Hughes Health Ctr.*, No. M2006-02306-COA-R3-CV, 2008 WL 544662, at *5 (Tenn. Ct. App. M.S., Feb. 26, 2008).

Plaintiffs therefore failed to meet the requirements of the Medical Malpractice Act when they did not tender an expert who could proffer testimony regarding causation. Accordingly, summary judgment was appropriate.

Plaintiffs further allege that Dr. Doers and the medical staff mishandled Decedent's living will. Since we affirm the grant of summary judgment based upon Plaintiffs' failure to tender an expert who could give testimony regarding causation all other issues alleged by Plaintiffs are pretermitted.

-10-

## V. CONCLUSION

The judgment of the trial court is affirmed and the case is remanded. Costs on appeal are assessed to appellants, Myrna Wheelock, Lester Wheelock, and Cortney L. Caldell.

_____
JOHN W. McCLARTY, JUDGE