# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 10, 2014 Session

## EDNA LEE WEAVER v. DIVERSICARE LEASING CORP. ET AL.

### Appeal from the Circuit Court for Anderson County
### No. BILA0350    Donald R. Elledge, Judge

_____

### No. E2013-01560-COA-R3-CV-FILED-JULY 28, 2014

_____

Edna Lee Weaver ("plaintiff") was employed as a bookkeeper for the Briarcliff Health Care Center, a nursing home facility in Oak Ridge. After plaintiff's employment was terminated, she brought this action against her former employer alleging (1) common law retaliatory discharge; (2) violation of the Tennessee Public Protection Act, ("TPPA"), Tenn. Code Ann. § 50-1-304 (2008 & Supp. 2013); and (3) violation of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-301 (2011). The trial court granted the employer summary judgment on the ground that plaintiff failed to show a causal link between the conduct alleged to be protected, _i.e._, speaking out against alleged harassment and discrimination against other Briarcliff employees, and her termination. The court further held that the employer established legitimate, non-discriminatory reasons for plaintiff's termination, and that plaintiff failed to present any evidence tending to show that there were genuine issues of material fact as to whether these reasons were pretextual. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

James H. Price, W. Allen McDonald, and Michael R. Franz, Knoxville, Tennessee, for the appellant, Edna Lee Weaver.

Alexandra Coulter Cross, Nashville, Tennessee, for the appellees, Diversicare Leasing Corp., Diversicare Management Services Co., and Advocat, Inc.

# OPINION

## I.

Plaintiff was hired as an assistant bookkeeper in 2005. She was quickly promoted to the position of bookkeeper, and held that position until she was fired in October 2010. Plaintiff was an "at-will" employee throughout her employment at Briarcliff. Briarcliff had several administrators from 2005 until 2009, and plaintiff testified that she generally had a good working relationship with each of them. Plaintiff consistently received positive employee reviews prior to August 2009, when defendant employer Diversicare Management Services Co., the corporate operator of Briarcliff, hired Elizabeth Carroll as the new administrator of its facility.

Problems arose when the position of Briarcliff's admissions coordinator came open in October 2009. Administrator Carroll hired Kristi Hall for the position. Several Briarcliff employees, including plaintiff, thought that Hall was unqualified for the job and that Carroll had unfairly passed over several Briarcliff employees that were more qualified, particularly a male, Kris Rhea, who worked in the social services department and had been serving as interim admissions coordinator. Plaintiff testified that she and other Briarcliff employees were "shocked" that Carroll hired Hall instead of Rhea for the job. It later came to light at the nursing home that Hall was the half-sister of Carroll's domestic partner, Julie Hall. This revelation generally did not sit well with some of the other employees.

Briarcliff had a "backup admissions team" in place to help process admissions to the facility when the admissions coordinator was unavailable, and to otherwise assist in the admissions process. The members of the backup admissions team were plaintiff (a white female); Kris Rhea (a white male); Chaunda Graham (an African-American female) and Kamika Mize (an African-American female). Friction developed between the backup admissions team and Administrator Carroll. Plaintiff testified by deposition that she and the other team members felt like Carroll was blaming them for Kristi Hall's shortcomings as coordinator and for not backing Hall up in the admissions process. Plaintiff further stated:

> Q: I'm trying to get you to tell me how Liz Carroll targeted the backup team. What actions did she take to target the backup team in your mind?
>
> A: Before verifying the facts basically jumping to conclusions that it was, you know, that we were at fault. That, you know, we were made out to be like we were pushing back on the – on Kristi Hall. Kristi had made comments to Liz [Carroll], and Liz,

you know, shared those comments that Kristi felt like she was being – that she wasn't liked by, you know, myself, Chaunda [Graham], and Kris [Rhea] because Kris didn't get the position.

*      *      *

Q: Was it always Kris or Chaunda or did she ever say that you or Kamika [Mize] failed to do something?

A: It was always Kris or Chaunda.

*      *      *

Q: Do you have any understanding or belief as to why Liz targeted Kris and Chaunda?

A: No.

Q: Do you believe it had anything to do with Liz's relationship with Kristi?

A: Yes.

Q: And explain that to me. Why do you believe it was related to Liz's relationship with Kristi?

A: My own personal opinion is that I feel like that [Carroll] felt she wanted to open up an opportunity for Kristi to give her a chance in a position that Kristi had no experience in, and by that maybe she was trying to cover up her own mistake by protecting Kristi.

Q: So she protected Kristi by blaming mistakes on Kris and Chaunda? Is that a fair understanding of what you just told me?

A: Yeah. I mean, that's what I feel. Kris and Chaunda basically did the majority of the admission backup and stuff . . . Chaunda had a separate part with the backup process, but Kris was the main one. He was the main one who was Kristi's backup.

Q: And he was the main one who Liz Carroll targeted?  Is that fair to say?

A: Yes.

Plaintiff was also a member of the Briarcliff morale committee, a group of employees who met monthly to, in plaintiff's words, "try to figure out ways to boost the morale within the facility."  Plaintiff named eight people who were members of the morale committee, and said there were other members whose names she couldn't remember.  Also on the morale committee were Ms. Graham and Nicole Cain, another African-American female employee.  On February 10, 2010, the day of a scheduled morale committee meeting, regional vice president Barry Bell was visiting the Briarcliff facility.  Bell was invited to sit in on the meeting.  The morale committee members aired their grievances about Carroll and her management of them and the facility at the meeting.  Plaintiff testified that there were "numerous things" brought up, but the primary issue revolved around Hall, the admissions process, and the backup team:

A: [T]here was one thing that was brought up in particular, I mean, with Kris Rhea and, you know, the issue with the backup team.  Details honestly I'm having a hard time, I really can't recall.

Q: You brought up the issue with the backup team being blamed for issues?

A: Yeah.  And that Kris, you know, was overlooked for the position and that, you know, my personal opinion felt like he was qualified.  And he's used as the backup for Kristi, you know, and again he wasn't good enough for the position but he was . . . good enough to back her up.

Q: Okay.  So the issues that you raised in that meeting were the issues with the backup team being targeted and Kris being overlooked for the position of admissions?

A: Right.  And the fact that any time we had an issue in the backup team and we had a group meeting we were always told [by Carroll that] "Barry and Robin [Jones, another regional vice president] back me up 100 percent."

-4-

Q: Okay. Anything else that you remember telling Barry Bell during this meeting?

A: No.

Ms. Graham similarly testified that "the main issue at the time was people were recognizing the unfair hiring process of the Admissions Coordinator, and then the backup team to admissions was picking up a lot of slack, working a lot of outside of our own department to get work done for the admissions process, and that was not typical from prior administrators." Graham further stated that at the time of the meeting with Bell, she did not suspect that Carroll was a racist or that her actions were racially motivated. Graham testified that "no one claimed to Barry Bell that Ms. Carroll gave people preferential treatment based on their race or their sex during that meeting."

Six and a half months after plaintiff gave her deposition, she filed her affidavit in opposition to summary judgment, wherein she stated that,

> In February 2010, a group of employees, including myself, complained to Barry Bell about Liz Carroll's harassment and preferential treatment, which was harming the morale of the facility. The complaints were not merely about Ms. Carroll's management style, but also included complaints that Ms. Carroll had unfairly overlooked Kris Rhea (a white male) for a promotion and had given the job to a white female. In addition, we told Mr. Bell that Ms. Carroll had stated that she had fired black employees at another facility and that those employees had unsuccessfully pursued EEOC charges.

At the end of the meeting, Bell said that he would address the committee's concerns with Carroll, that there would be no retaliation for airing these grievances, and that they could contact him directly if they had further concerns. According to plaintiff, the next day, at the morning meeting of the department heads of Briarcliff's staff, Carroll announced "that she wasn't in trouble and nothing came out of the meeting with her and Barry. And then she went on to say that there would no longer be a morale committee."

The defendant employer fired Nicole Cain on April 15, 2010. There is little information in the record about the circumstances surrounding Cain's termination. There is no testimony from Cain herself – only the first page of her charge of discrimination, filed

with the Equal Employment Opportunity Commission and the Tennessee Human Rights Commission, dated June 18, 2010. The substance of Cain's claim states as follows in its entirety:

> I have always been in good standing with the above company. However, when I told Elizabeth Carroll, Nursing Administrator, that I filed a complaint of discrimination against her for some harassment, write-ups and a suspension, Ms. Carroll said I was discharged.
>
> I believe I have been discriminated against because of my race (Black), and retaliation, [*sic*] all in violation of Title VII of the Civil Rights Act of 1964, as amended.

Plaintiff testified that it was her understanding that the reason given for Cain's termination was her alleged failure to complete paperwork, and that "after Ms. Cain was fired, paperwork that Ms. Cain was accused of not completing was found in Liz Carroll's office."

Graham testified that after the February morale committee meeting, she felt that Carroll began retaliating against her, stating:

> A: I felt like I was – I had started to become retaliated against.
>
> Q: Retaliated against for doing what?
>
> A: For speaking out. I was a very vocal part of speaking out when we were – the morale committee was talking to Mr. Bell, and immediately after that, things started to change. I had just gotten Employee of the Month in December, and this was in . . . February. And immediately after that, the very next week – I had been given permission to work a special schedule where I worked four days a week, [and] about a week or two after that, Liz sent me an e-mail saying that I could no longer work that schedule[.]
>
> *     *     *
>
> And then also in regards to retaliation, I started getting [a] constant overflow of e-mails to everything I did that was wrong, and especially as it related specifically to the Admissions

-6-

Coordinator and the admissions process. Ms. Hall was constantly going to Ms. Carroll complaining about either myself or the department, my department. There [was] constant questioning as to whether or not – how we were handling certain family situations. There was a period of time where I was getting constant e-mails about what Kris Rhea did – or was or was not doing.

It was just something every single day, there was something that I did or did not do, and . . . honestly, I felt like it was an effort to get me to just go ahead and leave.

On April 30, 2010, Carroll gave Graham a written reprimand stating the following:

Employee counseled for insubordination. Employee was present when room number was decided during morning meeting but took it upon herself to change the room number without discussing with Administrator. Employee has also resumed behavior of rolling her eyes and acting scorned if disagreed with.

Graham testified that she felt the reprimand was unwarranted and unfair. She refused to sign it and presented a one-page handwritten rebuttal. Plaintiff, along with director of nursing Don Hutson, signed the notice of reprimand. Graham testified that at the meeting with Carroll discussing the grounds for her discipline, she "felt the need to have a witness on [her] behalf, so she asked [plaintiff] to come, and she came and sat in" and signed the reprimand.

On or about May 30, 2010, Carroll tendered her resignation. Graham followed suit a couple of weeks later, tendering her resignation in mid-June. Each gave 30 days notice and continued to work at Briarcliff for roughly a month. June 25, 2010 was Carroll's last day as administrator of Briarcliff. That same day, Graham sent a three-page email to Diversicare CEO, Will Council, that stated as follows in pertinent part:

I have been harassed, discriminated against, belittled, and terrorized during my employment with Diversicare and most recently in the last eight months. . . . I am the current Social Services Director at Briarcliff Healthcare Center and have been since 2006. . . . I have recently put my notice in to end my employment at Briarcliff and . . . I have nothing else to lose nor gain from sending you this email. . . . I have always lived by the

rule that one can not fix a problem if they don't know that the problem exists and I am therefore voicing my concerns.

* * *

Since Ms. Carroll's time at Briarcliff she has not only terrorized myself but several other employees as well. During her time at Briarcliff Ms. Carroll unfairly passed up several applicants for many different positions in order to hire her friends and family. I do not have a problem with hiring of friends or family if they meet the qualifications; however, it is a problem when other qualified individuals are passed up in order to make that happen. An example of this would be the hire of the current Admissions Coordinator. . . . During [the hiring] process an applicant by the name of Kristi Hall applied. . . . [A]nother current employee who has a Master['s] degree in marketing and was currently improving the census was passed up. . . . In Ms. Carroll's effort to conceal the connection between herself and Ms. Hall, many lies were told and many other employees were "thrown under the bus" in an effort to make Ms. Hall look qualified. Though discovered, the relationship was not confirmed until Ms. Carroll hired another employee by the name of Julie Hall who accidentally disclosed the fact that she was Kristi's sister and Ms. Carroll's girlfriend/partner. That does not matter, what does matter is that same employee who was passed over for the position is constantly doing the duties of that position and constantly being harassed at the same time.

* * *

A couple of months ago, several employees asked Mr. Barry Bell during a visit to speak with him to bring forth our concerns. . . . Mr. Bell assured us that our concerns had and [sic] would be taken seriously and that we would not be retaliated against. That statement was false. The next day . . . Ms. Carroll advised us that she was not in trouble and that nothing would change. . . . From that point on Ms. Carroll did retaliate against all who she felt was involved including myself.

* * *

-8-

You may ask why we did not bring forth these concerns. The obvious reason is that if we were being retaliated against for our initial concerns then it would only continue. . . .Though other attempts were made to seek assistance, they were ignored and we were constantly reminded by Ms. Carroll that [regional vice presidents] Robin and Barry were behind her 100%. At this point we felt like there was no one to go to and AND we had watched one of our other fellow employees get fired unfairly.

*       *       *

These are just some of the examples of why I feel that I have been retaliated against and treated unfairly . . . Out of respect for you and your company I would like to inform you that I am considering but [have] not yet filed an EEOC claim. I don't understand how one individual can get away with so much. I don't understand how you can allow someone to make several individuals work in fear. I don't know what all Ms. Carroll has told upper management about me and at this point, I guess it is a m[oot] point as she was allowed to terrorize me up until she walked out the door. . . . Though Ms. Carroll was the physical presence that has caused these issues, it has been the lack of support by upper management that has given her the power to do this.

Diversicare hired Jodie Jones as Carroll's successor and the new administrator at Briarcliff. Her first day at work was July 1, 2010. Jones testified that she met Carroll during her job interview, and that Carroll gave her a tour of the facility, but they did not otherwise ever discuss Briarcliff or any of its employees. Jones testified that plaintiff and others came forward and voiced concerns about Hall and the admissions process, stating:

I had numerous individual employees that had made, you know, complaints or concerns voiced. [Plaintiff] was probably one of the most vocal at first. She had concerns about Kristi Hall, who was the admissions coordinator. . . . [Plaintiff's] concern was that [Hall] frequently was out of the building either marketing or under the pretense of marketing. With her being out of the building that was causing [plaintiff] and other people to have to pick up, you know, her job duties.

Jones investigated the complaints and subsequently asked Hall to resign, which she did.

On July 9, 2010, Diversicare sent in-house corporate counsel, Kyle Smith, to interview Briarcliff employees about Graham's allegations in her email to CEO Will Council. At that point, Graham had not filed a charge with the Equal Opportunity Employment Commission. She filed her EEOC charge on August 18, 2010. Jones testified that when Smith arrived for employee interviews, she "had no idea what it pertained to, who he was meeting with, et cetera." Smith and Jones did not discuss the purpose of the interviews, either before or after Smith conducted them. At that time, Jones was unaware of the complaints that had been voiced by Cain and Graham.

Plaintiff testified that in her interview with Smith, he asked her questions that "were targeted around Liz Carroll, and basically information [in Graham's] email to Will Council." Plaintiff stated that she told Smith generally about the situation with Carroll and Hall; plaintiff's perception that the admissions backup team, and particularly Kris Rhea, had been harassed and targeted; the fact that Carroll had repeatedly mentioned that unsuccessful EEOC claims had been made against her at the facility she had formerly supervised; the morale committee meeting with Bell; and the subsequent retaliation against committee members, including Cain and Graham. Plaintiff further testified as follows:

> Q: Did Liz Carroll make any comments that could be perceived in any way as racist to you or that you overheard her making to someone else?
>
> A: To me, no. I did hear the EEOC myself come up on different occasions.
>
> *     *     *
>
> Q: Did you tell Kyle Smith when you were interviewed by him that you believed that Ms. Carroll acted – that her actions were racially motivated at all?
>
> A: That was never a question that he presented. I mean, I answered his questions and he never brought up a racial question. I believe the EEOC was brought – was mentioned, as far as my comment telling him about the EEOC, but he never extended his questions out as far as there were any – he never elaborated.

Q: Mr. Smith didn't ask you anything about the EEOC, did he?

A: No, he didn't. No. I gave him the information that Liz had made the comments about the EEOC on numerous occasions. He didn't ask questions.

Q: Did you tell Barry Bell or anybody else tell Barry Bell during the meeting with him in February of 2010 that anyone in there believed that Liz Carroll's actions were racially motivated?

A: Not that I recall.

Q: Did anyone tell Barry Bell that they believed that they believed that Liz treated Kris Rhea badly because he was male?

A: No. At that meeting it was kind of at the beginning of things. It was after that that things seemed to escalate and it was an ongoing thing.

Q: What about in . . . July of 2010, . . . did you tell Kyle Smith that you believed that Liz Carroll's mistreatment of Kris Rhea was because he was male?

A: I don't think so, no.

According to plaintiff, Smith interviewed seven employees, including herself and Chaunda Graham, who had given notice of her resignation and was training her replacement at that point. Janet Bryant was present for each of the interviews. She testified as follows in pertinent part about the interviews:

Q: Well, tell me what basically happened in the meeting. Did the employees simply tell their story, or did Kyle Smith ask specific questions that he thought was relevant to the investigation?

A: I remember he let the employees talk. He may have asked a few questions, but mainly he let them talk and tell theirs, and he took some notes, I'm thinking, on a legal pad. I'm not sure. And then if there was a question or he needed something

explained, like who are you talking about or what are you doing, he would ask a question, but pretty much he let them speak.

Q: He wasn't then, as far as you knew, directing specific questions on specific topics? He was just letting them speak openly about what their concerns were?

A: He might bring them in and ask something specific if he didn't understand, but pretty much he let them speak.

Q: Were they told that . . . they were investigating a complaint by Chaunda Graham?

A: I don't think he told them specifically that he was investigating anything by Chaunda. Even Chaunda, I don't think he said anything specific like that to her.

*　　*　　*

Q: Do you remember that [plaintiff] brought up that Liz seemed to pick on Kris [Rhea], Nicole [Cain], and Shaunda?

A: I remember something to the effect about Kris. Nicole, I don't remember anything, but mainly Kris is the one I remember [plaintiff] talking about, because if I'm not mistaken, [plaintiff] had left and then came back and mentioned something about Kris.

Q: You say that you don't remember anything about Nicole?

A: No.

In his affidavit, Smith testified as follows regarding the investigation, interviews, and his conclusions:

On or about May 31, 2010, Ms. Carroll had given Diversicare notice that she was resigning her employment at Briarcliff and that she was moving to Florida to be near her elderly mother. June 25, 2010, the date of Ms. Graham's email, was also the last day of Ms. Carroll's employment with Diversicare.

-12-

Following Mr. Council's receipt of the email from Ms. Graham, David Hickman, Diversicare's Vice President of Human Resources, asked me to go to Briarcliff and investigate Ms. Graham's allegations.

On or about July 9, 2010, I visited Briarcliff and interviewed several department heads, including Plaintiff Lee Weaver, about the allegations in Ms. Graham's email.

In the interviews, I asked open-ended questions about each employee's experiences with Liz Carroll at Briarcliff.

All of the department heads I interviewed expressed the opinion that Liz Carroll created an uncomfortable work environment at Briarcliff. Several said that Ms. Carroll was "mean" to them and that they felt mistreated during her tenure.

While it was clear from these interviews that most of the department heads did not like Ms. Carroll's management style, no one claimed that Liz Carroll (or anyone else at Briarcliff) had treated any employee differently based on race or sex or for any other unlawful reason.

Because the employee complaints were generally directed at Ms. Carroll, who was no longer Briarcliff's administrator, and because no one had made any allegations of any unlawful conduct, I determined that no further action was required.

I did not discuss Ms. Graham's allegations or my investigation of those allegations with Jodie Jones, Briarcliff's new administrator.

(Numbering in original omitted.)

Jodie Jones testified that she became dissatisfied with plaintiff's performance in processing admissions. She stated in her deposition testimony,

Q: What kind of issues did you continue to have with [plaintiff]?

A: Timeliness.

-13-

Q: When you say "timeliness," what do you mean timeliness?

A: Timeliness of the financial verification, especially when we started looking at the referrals we were getting from managed care companies, which is a different type of insurance.

*       *       *

Q: When you addressed the issue of timeliness and the importance of participating in the admissions process did you continue to have issues with [plaintiff's] participation in the admissions process?

A: Yes.

Q: What continued issues or problems did you have?

A: [Plaintiff] voiced loudly her concerns with private managed care insurance. She did not want to take those patients for various reasons . . . So she was not happy about having to process this at all.

Q: She voiced her concerns with accepting managed care patients. Did she ever refuse to process managed care patient admissions?

A: Not blatantly refused, but by allowing them to sit on her desk and not process the preauthorization, in essence that's what she was doing because someone else from another facility would process it and get that patient.

Jones further stated that the new admissions coordinator, Amy Cox, came to her and reported complaints from family members of residents that plaintiff had been rude to them during the admissions process. Jones testified that Cox reported complaints that,

[plaintiff] started making phone calls to the families of these people that had the managed care insurance. You know, prior to their arrival at our facility the resident themselves or their family members would receive a call from [plaintiff] demanding

-14-

money up front, which, you know, doesn't set the tone for someone wanting to come to that facility if the first call they're getting from someone is, you know, demanding money in a very blunt, uncaring tone. I felt she was trying to sabotage the admission so that she wouldn't have to deal with those managed care claims.

On September 30, 2010, Jones disciplined plaintiff by providing a written "performance improvement action" form that states as follows:

> (1) Performance – All referrals, including managed care, will be presented in a timely [manner]. (2) Chain of Command – all internal issues are to be discussed with Administrator. (3) Customer Service – Bookkeeper will maintain a professional to [*sic*] residents, famil[ies] & staff at all times.

The "action to be taken to improve employee's performance" listed was "suspension"; plaintiff was suspended for the rest of the workday on September 30. Plaintiff was very upset and felt that the discipline was unwarranted and unfair. Jones testified that she and plaintiff spent about an hour talking about the issues addressed by the performance improvement action form, which plaintiff refused to sign. Plaintiff requested to know who had complained about her being rude or unprofessional. According to plaintiff, Jones gave her several names, including that of Doris Webber, a Briarcliff resident. Jones stated in her affidavit that "I refused to give her names and told her that she needed to move on and treat everyone professionally going forward." Kaye Robinson, Briarcliff's human resources director, was also present during this meeting.

Jones testified that after the meeting, the following took place:

> [Plaintiff] left my office and went to clock out, which the time clock is located in Kaye Robinson's office and she's over personnel, and [plaintiff] made the comment at the time that she was going to contact Kathy Moore. And it was almost a – Kaye expressed it to me as a threat. She was going to file a complaint and contact Kathy Moore.

Kathy Moore was a close friend of Briarcliff resident Webber and was involved in getting Webber placed at Briarcliff. Moore also held power of attorney on Webber's behalf. Jones did not know it then, but Moore is also a former mayor of Oak Ridge. Moore is characterized by defendants as an "influential" community member. Plaintiff testified that

-15-

she told Jones "that I would be glad to contact the family members and apologize if they felt like I had said something or done something that had offended them." Plaintiff denied telling Robinson that she was going to contact Moore, but it is clear that plaintiff communicated her intent at the meeting with Jones to contact certain family members and/or residents.

Plaintiff, who is a personal friend of Moore, did call her that day after she left work. She testified as follows regarding the reasons for her call, and what was said:

> A: Kathy Moore and I had a friendship. And, obviously, if I'm going to be accused of offending somebody, you know, I wanted to make sure that, you know, one, I had not offended anybody and that if they felt like I did I wanted to clear the air because, like I said, Kathy and I were friends outside the facility.
>
> *       *       *
>
> Q: Go ahead and tell me what you told Ms. Moore during that conversation.
>
> A: That I was informed by Jodie Jones that I had offended Ms. Webber. And I stopped by [Webber's] room on my way out to apologize, she was not there. So I was calling her to see if Ms. Webber had said anything to her in regards to me offending her. She said she had no knowledge of me offending Ms. Webber and that she would speak to Ms. Webber. And basically that was the gist of the conversation. And the fact, you know, I said, well, you know, when she asked me what was wrong, because I was crying, I informed her, you know, well, I was suspended for one day. I'm off tomorrow and I will go back to work on Monday.

In plaintiff's later-filed affidavit, she stated as follows:

> Upon reflection, I do not believe that I told Kathy Moore on September 30, 2010, that I had been suspended. During our conversation that day, I only told her that I was calling to apologize if I had done anything to offend her or Doris Webber.
>
> When I testified in my deposition that I had told Ms. Moore that I was suspended, I now believe that I was confusing our

-16-

conversation on that day with a subsequent conversation on October 4, 2010, when I told Ms. Moore that I had been terminated.

Moore testified that plaintiff did not tell her that she had been suspended, and that she found out about the suspension from an unnamed nursing assistant when she went to Briarcliff the next day. Moore stated in her deposition:

I kept asking [plaintiff] what was wrong and she would not tell me. . . . I found out she was suspended when I went over there with Doris Ann [Webber]. And Doris mentioned it to me and then a NA mentioned it to me that she had been suspended.

Q: Are you sure about that now?

A: I'm almost sure. I'm almost sure that [plaintiff] did not say it to me, because I got off the telephone and I said, there is something bad happening with [plaintiff], and I said, I can't understand it.

Plaintiff was scheduled to be off work the next day, Friday, October 1, 2010. Jones stated in her affidavit what happened that morning:

Late Friday morning, I returned from the bank to find Kathy Moore and Doris Webber . . . waiting for me. Ms. Moore confronted me when I entered the building and started demanding answers about [plaintiff's] employment status.

I was taken aback by being confronted by Ms. Moore about [plaintiff]. I told her I could not talk to her about [plaintiff's] employment. Ms. Moore stated that she felt that [plaintiff] was a good person and that she would hate to see anything bad happen to her. I agreed with Ms. Moore that [plaintiff] was a good person and said that she should be back at work on Monday.

I was very upset by this meeting with Ms. Moore and Ms. Webber. I felt that instead of being accountable for her actions, [plaintiff] was trying to make Briarcliff look bad to a resident and to an influential member in the community.

-17-

(Numbering in original omitted.)

Moore testified about the meeting with Jones as follows in pertinent part:

> Q: Ms. Cross [Diversicare's counsel] asked you a question about whether you thought that Ms. Jones might have been upset when you came to confront her about [plaintiff's] discipline. Did you go into the room in order to confront her?
>
> A: Oh, yes. We went and closed the door. It was just Doris and she and I.
>
> Q: Yes. I mean –
>
> A: That's all that was in the room. That was the only people in the room.
>
> Q: Well, but –
>
> A: I wouldn't have talked outside the room. I mean –
>
> Q: No, no, no. no. What I was really focusing on is the word confront her about [plaintiff's] suspension, slash, discipline. Was that the purpose of going into the room, was to have it out with Jodie Jones about [plaintiff]?
>
> A: No. What happened was . . . Doris was upset due to the fact that she had been accused of saying something that didn't happen.

After this meeting, Jones decided to terminate plaintiff's employment. She called Diversicare's Vice President of Human Resources and Kyle Smith to discuss the circumstances and her decision, and they determined that plaintiff could be terminated for cause because she "violated Diversicare's requirement that employees maintain confidentiality with respect to the operations, activities, and business affairs of Diversicare." On Monday, October 4, 2010, plaintiff was given the opportunity to resign, which she declined. Jones then told her that her employment was terminated.

Plaintiff filed this action on September 28, 2011, alleging retaliatory discharge in violation of Tennessee common law; the TPPA, commonly known as the "Whistleblower Act," Tenn. Code Ann. § 50-1-304; and the THRA, Tenn. Code Ann. § 4-21-301. Plaintiff does not allege that she was directly discriminated against, but rather that her employer unlawfully retaliated against her for her involvement in allegedly protected activity, *i.e.*, speaking out against alleged harassment and discrimination against Rhea, Cain, and Graham. After extensive discovery, Diversicare moved for summary judgment. The trial court granted summary judgment on all claims, holding as follows in pertinent part:

> Each of the causes of retaliation asserted by Plaintiff requires a showing of a causal link between the protected activity and the termination. Plaintiff has not shown a causal link between the conduct she claims was protected and her termination.
>
> . . . Diversicare presented evidence that legitimate, nondiscriminatory reasons existed for Plaintiff's termination. Plaintiff has failed to demonstrate that the stated reasons for her termination were pretextual.

(Numbering in original omitted.) Plaintiff timely filed a notice of appeal.

## II.

The issue presented is whether the trial court erred in granting summary judgment. In her brief, plaintiff breaks this primary issue into four sub-issues, reflecting the various arguments in support of her assertion that the court erred in granting summary judgment. Specifically, plaintiff argues that the trial court erred in (1) not recognizing and finding genuine issues of material fact; (2) stating in its oral ruling from the bench that "I can't make inferences" in ruling on the summary judgment motion; (3) erroneously stating certain facts; and (4) applying the wrong legal standard for determining whether plaintiff established that the nondiscriminatory reasons given by the employer were pretextual. We will address these arguments in turn.

## III.

Because the complaint was filed after July 1, 2011, Tenn. Code Ann. § 20-16-101 (Supp. 2013) applies to our analysis of summary judgment in this case. That statute provides:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of

proof at trial shall prevail on its motion for summary judgment if it:

(1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or

(2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

*See also* **Harris v. Metro. Dev. & Housing Agency**, No. M2013-01771-COA-R3-CV, 2014 WL 1713329 at *3 (Tenn. Ct. App. M.S., filed Apr. 28, 2014); **Wells Fargo Bank, N.A. v. Lockett**, No. E2013-02186-COA-R3-CV, 2014 WL 1673745 at *2 (Tenn. Ct. App. E.S., filed Apr. 24, 2014).  As we observed in **Harris**,

> Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Tenn. R. Civ. P. 56.04.
>
> Summary judgments do not enjoy a presumption of correctness on appeal.  **BellSouth Adver. & Publ'g Co. v. Johnson**, 100 S.W.3d 202, 205 (Tenn. 2003).  The resolution of a motion for summary judgment is a matter of law, thus, we review the trial court's judgment de novo with no presumption of correctness. **Martin v. Norfolk Southern Ry. Co.**, 271 S.W.3d 76, 84 (Tenn. 2008).  The appellate court makes a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied.  **Hunter v. Brown**, 955 S .W.2d 49, 50-51 (Tenn. 1977).

2014 WL 1713329 at *4.  In making this determination,

> We must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor.  **Martin v. Norfolk S. Ry. Co.**, 271 S.W.3d 76, 84 (Tenn. 2008); **Luther v. Compton**, 5 S.W.3d 635, 639 (Tenn. 1999); **Muhlheim v. Knox Cnty. Bd of Educ**., 2 S.W.3d 927, 929 (Tenn. 1999).  If the undisputed facts support only one conclusion, then the court's summary judgment will be

-20-

upheld because the moving party was entitled to judgment as a matter of law. See **White v. Lawrence**, 975 S.W.2d 525, 529 (Tenn. 1998); **McCall v. Wilder**, 913 S.W.2d 150, 153 (Tenn. 1995).

**Wells Fargo Bank,** 2014 WL 1673745 at *2.

In **Sykes v. Chattanooga Housing Authority**, 343 S.W.3d 18, 26 (Tenn. 2011), the Supreme Court stated as follows regarding the summary judgment standard as applied to retaliatory discharge cases:

> In the recent cases of **Kinsler** [**v. Berkline, LLC**, 320 S.W.3d 796 (Tenn. 2010)] and **Gossett v. Tractor Supply Co.**, 320 S.W.3d 777 (Tenn. 2010), this Court held that the **Hannan** summary judgment analysis is to be applied in retaliatory discharge actions in the same way as in other cases, and rejected the federal **McDonnell Douglas** framework of allocation of burdens and order of presentation of proof of each party in favor of the ordinary Tennessee summary judgment standard. **Gossett**, 320 S.W.3d at 785–86; **Kinsler**, 320 S.W.3d at 801.

(Footnotes omitted.) The **Sykes** Court, in footnote 4 of the opinion, cited 2011 Tenn. Pub. Acts 461, an amendment to Tenn. Code Ann. §§ 4-21-311, 50-1-304, and 50-1-701, that functionally overrules the retaliatory discharge summary judgment analysis in **Kinsler** and **Gossett**, and observed that the amendment is "applicable to causes of action accruing on or after June 10, 2011." *See* 2011 Tenn. Pub. Acts 461; **Coleman v. Humane Society of Memphis**, No. W2012-02687-COA-R9-CV, 2014 WL 587010 at *8, n.7 (Tenn. Ct. App. W.S., filed Feb. 14, 2014). In this case, plaintiff's causes of action accrued no later than October 4, 2010, the date her employment was terminated. **Weber v. Moses**, 938 S.W.2d 387, 392-93 (Tenn. 1996). Thus, the law prior to the amendment applies.

IV.

A.

In Tennessee, the general rule governing employment relationships that do not involve a contract for a definite term is the long-established employment-at-will doctrine. **Guy v. Mut. of Omaha Ins. Co.**, 79 S.W.3d 528, 534-35 (Tenn. 2002); **Sykes**, 343 S.W.3d at 26. This doctrine "recognizes the concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause

at all, without being guilty of a legal wrong." ***Coleman***, 2014 WL 587010 at *17. "The employment-at-will doctrine is a bedrock of Tennessee common law." ***Franklin v. Swift Transp. Co.***, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006). The rule is not absolute, however; the Supreme Court and the General Assembly have recognized certain restrictions on the right of an employer to discharge an employee. In ***Chism v. Mid-South Milling Co.***, 762 S.W.2d 552 (Tenn. 1988), the Court, discussing the tort of retaliatory discharge, stated the following:

> Both by statute and case law in this and other states some restrictions have been imposed upon the right of an employer to terminate an employee, usually for reasons of well-defined public policy. For example, . . . [t]here are restrictions upon employment or termination of persons for discriminatory reasons involving race, creed, color, sex, age, religion or national origin. See T.C.A. § 4-21-401(a).

> \*     \*     \*

> It is obvious that the exception cannot be permitted to consume or eliminate the general rule. Corporate management, in cases such as this, must be allowed a great deal of discretion in the employing or discharging of corporate officers, where the latter are not employed for a definite term and have no formal contract of employment. ***Whittaker v. Care-More, Inc.***, 621 S.W.2d 395, 397 (Tenn. App. 1981). To be liable for retaliatory discharge in cases such as this, the employer must violate a clear public policy. Usually this policy will be evidenced by an unambiguous constitutional, statutory or regulatory provision.

762 S.W.2d at 555, 556.

The legislature has also created a statutory retaliatory discharge action, the Whistleblower Act, codified at Tenn. Code Ann. § 50-1-304, that is cumulative to a common law action.[1] ***Guy***, 79 S.W.3d at 539. The statute provides in pertinent part as follows:

---

[1]*See* 2014 Tenn. Laws Pub. Ch. 995, enacted May 22, 2014, amending Tenn. Code Ann. § 50-1-304(g) to delete the phrase "under Tennessee common law" and enacting subsection (h) to provide: "This section abrogates and supersedes the common law with respect to any claim that could have been brought under this section." This amendment takes effect and "shall apply to all actions accruing on or after" July 1, 2014.

(b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.

*     *     *

(d)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tennessee courts have emphasized that the retaliatory discharge "exception to the employment-at-will doctrine must be narrowly applied." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 n.3 (Tenn. 1997); *Chism*, 762 S.W.2d at 556; *Sykes*, 343 S.W.3d at 26 (describing the Whistleblower Act as a "narrowly crafted exception"); *Franklin*, 210 S.W.3d at 530 ( "the earliest Tennessee cases recognizing retaliatory discharge have emphasized that it is an important, but narrow, exception to the employment-at-will doctrine").

A plaintiff asserting a common law retaliatory discharge claim has the burden of proving the following four elements:

(1) that an employment-at-will relationship existed;

(2) that the employee was discharged;

(3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and

(4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Webb v. Nashville Area Habitat for Humanity*, 346 S.W.3d 422, 437 (Tenn. 2011).

The elements of a claimant's action for statutory retaliatory discharge – violation of the Whistleblower Act – are similar; a plaintiff must prove the following four elements:

-23-

(1) the plaintiff was an employee of the defendant;

(2) the plaintiff refused to participate in or remain silent about illegal activity;

(3) the defendant employer discharged or terminated the plaintiff's employment; and

(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Id.* at 437; *Sykes*, 343 S.W.3d at 27. Although there are several distinctions between the two causes of action, a primary difference between the common law and statutory claims is that to demonstrate a violation of the Whistleblower Act, a plaintiff must prove "the essential element of an *exclusive causal relationship* between the plaintiff['s] whistleblowing activity and [his or her] discharge." *Sykes*, 343 S.W.3d at 21 (emphasis added). To prevail on a common law action, a plaintiff need only demonstrate that his or her exercise of protected rights or compliance with clear public policy was a substantial factor in the employer's decision to discharge the employee. *Guy*, 79 S.W.3d at 535.

Our review of the record persuades us that the evidence before us is not sufficient to create a genuine issue of material fact as to an essential element of plaintiff's claim – that her alleged exercise of protected activity was either the sole factor or a substantial factor in the employer's decision to terminate her employment. In short, it is undisputed that Jodie Jones, who made the decision to fire plaintiff, was unaware of plaintiff's prior complaints about former administrator Carroll and was not apprised of the fact that former employees Cain and Graham had filed EEOC claims; nor was Jones aware of any connection, to the extent there was a connection, between the EEOC claims of the other employees and plaintiff's complaints about Carroll. When Smith arrived at Briarcliff to conduct interviews in an investigation of the complaints in Graham's email, Jones had been on the job as new administrator for less than two weeks. At that point, Carroll, the subject of all complaints by Briarcliff employees, including those of plaintiff, was gone. Chaunda Graham had given her notice and was working her last couple of weeks. Jones' uncontradicted testimony on what she knew about earlier happenings at Briarcliff, and when she knew it, is as follows:

Q: So I take it you didn't discuss any of the employees of Briarcliff with Liz [Carroll] at all.

A: No.

Q: What about after you became administrator? Did you have any occasion to discuss any of the employees with Liz Carroll?

A: No. I had no conversations with her.

Q: You've had no conversations with Liz Carroll since your meeting with her on the day of your interview?

A: Correct.

\* \* \*

Q: Did anyone, either prior to or after you became administrator, ever have occasion to discuss with you any of the issues surrounding Liz Carroll and her leaving her employment at the Briarcliff facility?

A: No.

\* \* \*

Q: Did anyone advise you that Chaunda Graham had made a complaint about Liz Carroll?

A: No. Actually, when I got there I found out that Chaunda had worked there for a long time, was moving, and was working out her notice. And so I only got to work with her for a brief period of time. But, you know, they had a going away party for her. There was nothing noted or said that there was any other reason for her leaving other than her husband got another job out of state. . . . I had no, you know, no idea that she had any issues or concerns with work.

\* \* \*

Q: Were you ever asked to participate in any investigation by any governmental agencies of any claims of harassment or discrimination related to employees at Briarcliff after you became administrator?

A: No.

Q: No one ever discussed an EEOC claim by Ms. Graham with you at any point?

A: Not that I can recall, no.

\*      \*      \*

Q: When Kyle Smith came to the facility, you said in early July, did he tell you who the employees were that he was going to be meeting with?

A: No.

Q: Did you observe the employees that Kyle Smith met with while he was there?

A: No.

Q: After he left was there any conversation that you observed or heard about that discussed who the folks were that Kyle Smith had met with and talked to?

A: No.  Nobody at the facility mentioned anything.

As already noted, Smith confirmed in his affidavit that "I did not discuss Ms. Graham's allegations or my investigation of those allegations with Jodie Jones, Briarcliff's new administrator."

Furthermore, Jones testified as follows in her affidavit:

I was not aware at the time of [plaintiff's] termination that [plaintiff] had previously complained about the prior administrator.  I met the prior administrator only once and did not know her.  Neither Mr. Hickman [vice president of human resources] nor Mr. Smith discussed any complaints about Ms. Carroll with me until after [plaintiff's] termination. [Plaintiff's] prior complaints, which I understand now had been made

-26-

months before her termination, did not factor into my decision
to terminate her.

Because Jones was unaware, when she fired plaintiff, of her prior complaints about unfair treatment and retaliation by Carroll, those complaints cannot have been a factor in the decision to terminate her employment.

There is another reason that summary judgment must be affirmed on plaintiff's statutory retaliatory discharge claim. When a plaintiff's Whistleblower Act claim is based on an allegation that he or she was discharged solely for *refusing to remain silent about* – as opposed to refusing to participate in – illegal activities, as in this case, there is a "reporting requirement." Such a claimant "must establish that he [or she] made 'a report to some entity other than the person or persons who are engaging in the allegedly illegal activities.' " **Lawson v. Adams**, 338 S.W.3d 486, 497 n.3 (Tenn. Ct. App. 2010) (quoting **Collins v. AmSouth Bank**, 241 S.W.3d 879, 885 (Tenn. Ct. App. 2007)); **Gossett**, 320 S.W.3d at 788; **Bright v. MMS Knoxville, Inc.**, No. M2005-02668-COA-R3-CV, 2007 WL 2262018 at *5 (Tenn. Ct. App. M.S., filed Aug. 7, 2007) (applying reporting requirement to affirm directed verdict against plaintiff where he "has simply not demonstrated that he was 'blowing a whistle' on illegal activity."). In this case, plaintiff presented no evidence that she reported any allegedly illegal activity to an entity other than her superiors at Briarcliff.

B.

Plaintiff also brought a claim under the THRA, which provides in pertinent part as follows:

It is a discriminatory practice for a person or for two (2) or more persons to:

(1) Retaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter[.]

Tenn. Code Ann. § 4-21-301. As the Supreme Court has observed:

[A] claimant must prove the following four elements to prevail on a retaliation claim under the THRA:

-27-

(1) that [the plaintiff] engaged in activity protected by the THRA;

(2) that the exercise of [the plaintiff's] protected rights was known to the defendant;

(3) that the defendant thereafter took a materially adverse action against [the plaintiff]; and

(4) there was a causal connection between the protected activity and the materially adverse action.

*Sykes*, 343 S.W.3d at 29 (brackets in original) (quoting *Allen v. McPhee*, 240 S.W.3d 803, 820 (Tenn. 2007) (abrogated on other grounds by *Gossett*, 320 S.W.3d at 783-84)).

Diversicare argues that plaintiff did not engage in an activity protected by THRA, correctly pointing out that any link between allegations of improper retaliation based on race by Cain and Graham – to the extent that there were any – and plaintiff's involvement in reporting them, is missing. In this regard, Diversicare notes that there is no proof that allegations of *racially-motivated discrimination* were raised by any Briarcliff employee at the February morale committee meeting with Barry Bell, or in the July interviews with Kyle Smith, or in any other forum. There is undisputed evidence that before the Briarcliff employees complained about Carroll's relationship with Hall and her treatment of the admissions backup team, Carroll promoted Cain, and gave Graham highly positive employee reviews. There is an abundance of evidence from which a trier of fact could conclude that Carroll retaliated against anyone who spoke out against her or her management decisions, but that Carroll was an "equal opportunity retaliator" who mistreated employees without regard to race or gender. In this regard, both plaintiff and Graham testified that Carroll's worst treatment was inflicted on Kris Rhea, a white male. There is also evidence that neither EEOC claims nor allegations of racially-motivated conduct arose during the Smith interviews, although Smith gave the interviewees the opportunity to vent any concerns they might have had.

Nevertheless, viewing all of the evidence in the light most favorable to plaintiff's claims and resolving all reasonable factual inferences in her favor, we note that there is some scant evidence in the record from which a trier of fact might reasonably conclude that plaintiff engaged in conduct protected by the THRA, *i.e..*, speaking out against allegedly discriminatory behavior. Plaintiff did testify that she told Smith that Carroll had inexplicably and repeatedly mentioned earlier unsuccessful EEOC claims filed against her when she was administrator of another nursing home facility. Thus, we do not base our decision on a

-28-

determination that plaintiff did not engage in protected activity, because even assuming *arguendo* that she did, her THRA claim must fail for another reason – the lack of a causal connection between the protected activity and the materially adverse action. For the same reasons discussed above, Jones' undisputed lack of knowledge of plaintiff's earlier complaints precludes any rational inference that Jones' decision to fire plaintiff was causally connected to any protected activity. Thus, Diversicare has demonstrated that the nonmoving party's evidence is insufficient to establish an essential element of her claim, and summary judgment was therefore appropriate.

In its oral ruling from the bench, the trial court stated:

> I've read and reread these documents . . . I can't make inferences. I cannot make – I have to look at the facts. And I don't find any disputed facts.

Plaintiff correctly asserts that in ruling on a motion for summary judgment, a trial court not only may make inferences, but is required to draw any reasonable inferences in favor of the non-movant. *See, e.g., **Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 84 (Tenn. 2008); ***Wells Fargo Bank,*** 2014 WL 1673745 at *2. Defendants argue that by the comment "I can't make inferences," the trial court meant, not that it wasn't allowed to draw inferences, but that it wasn't able to draw any reasonable inferences in plaintiff's favor, given the state of the proof in the record, because the evidence didn't reasonably support such inferences. Perhaps this is true. Regardless of the reasons for the trial court's facial misstatement, we have conducted our own independent de novo review of the record to "make[] a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied," as we must. ***Harris***, 2014 WL 1713329 at *4. We have also drawn any reasonable allowable inferences in favor of plaintiff, the non-movant. Any error by the trial court in making the statement "I can't make inferences" was harmless in light of our review and holding that summary judgment was warranted under the legal and factual analysis stated herein.

The trial court also stated in its oral ruling that it found as an undisputed fact "that even after [plaintiff] participated in the interviews involving the EEOC problems with the individuals that had been brought out she was, in fact, given a glowing review and given a raise." This was not what happened. Although the record establishes that plaintiff was given a number of "glowing" employee reviews, some of which were written by Liz Carroll, and that she was given the highest allowable raise during Carroll's tenure as administrator because of her excellent employee record and review, this happened *before* the Smith interviews, not after. To plaintiff's credit, her employee evaluations in the record paint a picture of an excellent and conscientious employee. But plaintiff was not "given a raise and given a higher evaluation" after the Smith interviews, as the trial court erroneously found.

This error is not material and does not affect the analysis in our opinion, however. It does not bear upon what we have determined is the critical issue in this case – the absence of proof to establish the required element of a causal link between plaintiff's alleged protected conduct and her discharge, and, similarly, the absence of proof that a substantial factor in the employer's decision to discharge the employee was plaintiff's exercise of protected rights. Our holding on this point is determinative and renders moot the issue of whether the trial court correctly applied its pretext analysis.

V.

The summary judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, Edna Lee Weaver. This case is remanded to the trial court, pursuant to applicable law, for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE