IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 17, 2014 Session

IN RE: GRACE Y.

Direct Appeal from the Juvenile Court for Coffee County
No. 13J-0315      Timothy Brock, Judge

No. M2013-02734-COA-R3-PT - Filed September 30, 2014

This appeal involves the termination of a father's parental rights to his five-year-old daughter. In 2010, the daughter was adjudicated dependent and neglected due to her parents' substance abuse, and she was placed in the custody of her paternal grandmother and step-grandfather. In 2013, these same grandparents filed a petition, as prospective adoptive parents, seeking to terminate the father's parental rights on the statutory ground of persistent conditions. The trial court found that the ground of persistent conditions had been proven by clear and convincing evidence, and it also found by clear and convincing evidence that termination of the father's parental rights was in the child's best interest. The father appeals. We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

BRANDON O. GIBSON, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Peter Trenchi, III, Sewanee, Tennessee, for the appellant, Roy Y.

John Edward Nicoll, Clarksville, Tennessee, for the appellees, Bonnie B. & Larry B.

OPINION

I. FACTS & PROCEDURAL HISTORY

Grace Y. was born out-of-wedlock in August 2008. Around April 2010, the Department of Children's Services ("DCS") removed Grace from her parents' custody and filed a petition to adjudicate her dependent and neglected. Grace's parents waived their right to an adjudicatory hearing and consented to entry of an order finding that Grace was dependent and neglected due to their substance abuse. At the time, Grace's father ("Father") was incarcerated in the county jail. The juvenile court's adjudicatory order granted

temporary legal custody of one-year-old Grace to Father's mother and stepfather ("the Grandparents").

The following year, when Grace was two years old, the juvenile court held another hearing and granted a motion filed by DCS to close the case. Father appeared at the hearing and agreed that Grace should remain in the custody of the Grandparents because he was unable to care for her due to a lack of income and stable housing. The juvenile court's order provided that Father could have unsupervised "day-time visits" with Grace, and it ordered him to pay the Grandparents $25 per week in child support.

In March 2013, when Grace was four years old, the Grandparents filed a petition to terminate Father's parental rights.[1] The Grandparents' petition alleged that they had acquired custody of Grace from her parents in April 2010, and it stated that the juvenile court had formally awarded them temporary custody in May 2011. The Grandparents asserted that statutory grounds for termination existed due to abandonment, Tenn. Code Ann. § 36-1-113(g)(1), and persistent conditions, Tenn. Code Ann. § 36-1-113(g)(3). They also asserted that termination of Father's parental rights was in Grace's best interest. The Grandparents sought complete guardianship of Grace so they could proceed with the filing of an adoption petition. The juvenile court appointed a guardian ad litem and appointed counsel for Father, who was incarcerated.

The juvenile court conducted a bench trial on the petition against Father on November 15, 2013. Father was transported from prison to the juvenile court for trial. At the beginning of the trial, counsel for the Grandparents informed the trial judge that the Grandparents were withdrawing their allegations pertaining to the ground of abandonment and proceeding solely on the ground of persistent conditions. Counsel for Father orally moved for bifurcation of the hearing, asking the trial court to first hear evidence pertaining to grounds for termination before considering evidence pertaining to best interest. The trial judge denied the motion, stating that he expected the proof to overlap and that he did not want "to hear things twice." During the trial, the court heard testimony from the Grandparents and from Father.

The trial judge announced his decision at the conclusion of the trial and entered a written order on December 3, 2013. For reasons that will be discussed in detail below, the trial judge found, by clear and convincing evidence, that the ground of persistent conditions had been established and that termination of Father's parental rights was in Grace's best interest. Consequently, the trial court terminated Father's parental rights and awarded guardianship of Grace to the Grandparents, as prospective adoptive parents. Father timely

---

[1]The petition also sought termination of Grace's mother's parental rights, but Grace's mother consented to the termination of her parental rights, which is not at issue on appeal.

filed a notice of appeal.

## II. ISSUES PRESENTED

Father presents the following issues, which we have slightly reworded, for review on appeal:

1. Whether the trial court erred in finding that Father made no substantial change in the conditions that led to removal of the child and other conditions in his life;

2. Whether the trial court erred by projecting that future change was unlikely;

3. Whether the trial court's best interest analysis failed to consider the Grandparents' shortcomings in caring for Father; and

4. Whether the trial court erred procedurally by denying Father's request to bifurcate the hearing to determine grounds before best interest.

For the following reasons, we affirm the decision of the juvenile court and remand for further proceedings.

## III. STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.*

Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. In light of the constitutional dimension of the rights at stake in a termination proceeding, the person seeking to terminate these rights must prove all the elements of the case by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination, but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Valentine*, 79 S.W.3d 532, 546 (Tenn. 2002)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) amount to clear and convincing evidence that one of the statutory grounds for termination exists. *Id.* at 639-40. Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV. DISCUSSION

### A. Persistent Conditions

This case involves the statutory ground for termination that is commonly referred to as "persistent conditions," defined in Tennessee Code Annotated section 36-1-113(g)(3) as existing when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C)The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2010 & Supp. 2013). In order to terminate parental rights, there must be clear and convincing evidence of each of these elements. *In re Valentine*, 79 S.W.3d at 550. The purpose behind the "persistent conditions" ground for terminating parental rights is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). In cases involving this ground, it is not necessary to prove that a parent-child relationship cannot be salvaged, nor is it necessary to show that a parent is "currently harmful" to a child's safety or future emotional stability. *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). The statutes governing termination of parental rights recognize a child's need for a permanent, stable environment. *Id.* Accordingly, the question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with periodic visits with the parent. *Id.* A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition that prevents the safe return of the child to the parent's care. *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000).

Here, it is undisputed that Grace was removed from her parents' home by order of a

court for a period of six months.[2]  In fact, by the time of trial, Grace had been in the custody of the Grandparents for over three years.  Therefore, the determinative issues are whether the conditions that led to removal (or other conditions that would cause further abuse or neglect and prevent the child's safe return) still persist; whether there is a likelihood that these conditions will be remedied at an early date so that the child can be safely returned to Father "in the near future"; and whether continuation of the parent-child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3).

The condition that led to Grace's removal from the home, namely, substance abuse, had been present in Father's life for many years.  Father was 34 years old at the time of trial. He first went to prison when he was 18, and he was released at the age of 25.  Father testified that his alcohol abuse was "founded" during his prison term, as he found a way to make alcohol in prison.  Upon his release, he abused alcohol and drugs continuously for the next decade.[3]  He used alcohol on a continuous basis after Grace was born in 2008.  Father admitted that Grace was removed from his custody in 2010 due to his substance abuse problem.  Father was incarcerated from April to September of 2010 for a second-offense DUI and evading arrest.  He was ordered to complete a substance abuse treatment program, and he completed a five-month, five-day-per-week outpatient program in 2011.  At that time Father was diagnosed as having a substance abuse problem and was directed to abstain from using drugs or alcohol.  Father initially testified that he "was clean for a substantial amount of time" after he completed the program, but when pressed on this issue, he conceded that he only stayed sober for about two months after the program ended.  Father said, "I mean, in my run of things, that was substantial."  After that brief period, Father resumed his abuse of alcohol, and he also used marijuana, hydrocodone, and methamphetamine on occasion. He acknowledged that he returned to these habits despite his knowledge that it was his substance abuse, "[f]or the most part," that prevented him from taking care of his daughter. Father admitted that he had been arrested for at least "two or three" alcohol-related offenses since the completion of his treatment program.  Father was arrested for public intoxication in September 2011, which violated his probation and would eventually lead to his return to prison.

Grandmother testified at trial about occasions when Father visited with Grace, even

---

[2]The persistent conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005).  Here, Father stipulated to the entry of the order in which the juvenile court found by clear and convincing evidence that Grace was dependent and neglected due to her parents' substance abuse.

[3]The trial judge described Father as "brutally honest."

after his substance abuse treatment, when he would be "stumbling drunk" when he brought Grace home. She testified about particular occasions in early 2012 when Father returned "highly intoxicated" and "didn't know which end was up." During his testimony, Father admitted that he consumed "a six pack or so" during one of these visits on Easter. Based upon these incidents, Grandmother informed Father that he would only be permitted to visit with Grace at the Grandparents' home, and he would not be allowed to leave with her. Grandmother said she was concerned by the fact that Father's drinking "was just continuous." Grandmother estimated that, since she obtained custody of Grace, Father had been incarcerated "probably no less than half a dozen times," averaging about "once every three to six months." Grandmother said Father had no relationship with Grace while he was incarcerated because she refused to take Grace to jail or prison to visit him. She said during the periods when Father was not incarcerated, he visited with Grace a couple of times per month. Grace's step-grandfather testified that he had two or three conversations with Father in order to convey that Father "really needed to get rid of [his substance abuse problem] if he really wanted to be in [sic] part of [Grace's] life," but Father did not show any signs of improvement thereafter.

At trial, Father claimed that he was finally motivated to quit drinking after an incident that occurred at the end of July 2012. Father said he "woke up in the hospital" and discovered, from receipts in his pocket, that he had consumed four cases of beer and seven small bottles of vodka in a thirty-hour period. Father said he "come to and pretty much escaped the hospital, went to the store, bought another case of beer and commenced to drinking on that." Father said he woke up the next day trying to decide what day it was, "let alone what month," and he was "crushed" when he realized that it was almost Grace's birthday. Father said he was also scared by the fact that he did not know whether he had tried to kill himself. Father said he resolved, at that point, to quit "everything."

About two weeks after this resolution, however, Father returned to jail for violation of his probation and theft of property, and he remained there from August 9 until mid-December 2012. Father was incarcerated again from January 29 to February 21, 2013, based on a community corrections violation. He returned to prison in early March 2013, around the time of the filing of the termination petition, for violation of probation, apparently due to a third DUI and reckless endangerment charge. He remained incarcerated at the time of trial in November 2013. Father said he attempted to take advantage of alcohol and drug treatment classes that were offered in prison, but the waiting list was too long. Father testified that he expected to be released in six to eight months. He acknowledged that he had been eligible for parole a few months prior to trial, but he informed the parole board that he did not desire to be paroled. He explained that parole was "hard" for him, stating, "that's just one more appointment, one more engagement, one more responsibility that I would have to do." The trial judge questioned Father about his decision to forego the possibility of parole

and remain in prison, specifically asking whether Father feared that he would not be able to complete the conditions of his parole. Father said, "Honestly, yeah, I think I did." As for his plans after release, Father said he was hoping to get accepted at a halfway house, but if he did not, he would "just get out and try again." Father did not have any plans for employment, but he said he intended to stay with his friend and his friend's fiancée until he could "get on [his] feet." Because of his numerous offenses, Father is a habitual traffic offender, and he will not be eligible for a driver's license for a number of years.

On appeal, Father challenges the trial court's finding of persistent conditions on two fronts. First, he asserts that the trial court erred in finding that he made no substantial change in the conditions that led to Grace's removal and other conditions in his life. Second, he contends that the trial court erred by projecting that future change was unlikely. Father emphasizes that he was sober from around August of 2012 until the time of trial in November 2013. The trial court made extensive findings with regard to these two elements of the ground of persistent conditions, describing the testimony regarding Father's alcohol and drug use, his outpatient treatment in 2011, his repeated incarcerations, his use of alcohol during visits with Grace, and the incident that led to his hospitalization. The court then concluded:

> [T]his Court finds by a clear and convincing evidentiary standard that the conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parents, still persist. . . .
>           . . . .
> [Father's] substance abuse is not a new issue. It is and has been a long standing problem in his life. [Father] testified that he first began using alcohol and drugs when he was in his teens. He testified that during the time he was imprisoned during his early 20's, he found a way to make alcohol in prison. He admitted that his substance abuse has had negative ramifications throughout his life. These negative ramifications have included numerous arrests for alcohol/drug related offenses, time in jail, poor job history, unstable housing, and loss of driving privileges.
> During the more than three years in which the [Grandparents] have had custody of the child, [Father] has failed to resolve his substance abuse problem. Although [Father] maintains that this time it is different, the Court finds that the best predictor of future behavior in this particular case is past behavior. [Father] has suffered throughout most of his life with substance abuse. Even after receiving substance abuse treatment in the dependency and neglect action, [Father] admitted to using alcohol in excess as well as certain illegal drugs. Moreover, [Father] testified that he passed up an opportunity to

-8-

be released on parole because he did not know whether he would be able to abide by the conditions of release. As such, from all the evidence presented, it is established by clear and convincing evidence that [Father's] substance abuse problem still persists.

With regard to the likelihood that these conditions would be remedied at an early date, to enable Grace to return to Father's custody in the near future, the court made these additional findings:

Furthermore, the Court further finds by a clear and convi[nc]ing evidentiary standard that there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future.

. . . .

[Father] testified that he will be in prison for approximately another six to nine months. He further testified that he does not have any immediate prospects for employment upon his release and that he will likely have to live at a halfway house or with friends upon his release. He admitted that he has been declared an habitual traffic offender, and thus he will be prohibited from driving a vehicle for the foreseeable future. Although he testified that he has signed up to take substance abuse classes in prison, he has not yet been enrolled in such program.

The Court finds that because of [Father's] longstanding substance abuse problems, his remaining period of incarceration, and his lack of prospects for employment and stable housing, there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to [Father] in the near future. At this point, the child has been in the custody of the [Grandparents] for more than three years. Even if [Father] was extremely successful in his rehabilitation after his release from prison, it would still take [Father] several more years to successfully address his substance abuse problems and obtain stable employment and housing to be able to take care of the child. More realistically, [Father's] rehabilitation will take much more time.

We agree with the trial court's conclusions. Despite Father's protestation that he "quit everything" about two weeks prior to his incarceration in August 2012, he has not been out of jail or prison for any appreciable length of time since that date in order to demonstrate his commitment to sobriety. Although Father stresses that, by the time of trial, he had been sober for about fifteen months, by our estimation, he had only been out of jail or prison during that time period for a total of about sixty days, and these were non-consecutive days, spread out

over the course of three separate time periods. At trial, Father acknowledged that he "had points where [he] tried to stay sober" in the past, but "sometimes [he] would fall back into it." Even after having his daughter removed from his custody and attending a treatment program for five months, Father was unable to stay sober. Father candidly admitted, "I've been through all the programs and, I mean, eventually it just boils down to whether you want to quit, you know, or not, you know." He said, "there is a point where you've got to be done. I mean, there is only so many classes you can take, and people tell you this and that. I mean, it inevitably falls down to you. You've got to tell yourself you're done." While Father states his commitment to sobriety upon his release from prison, we agree with the trial court's conclusion that Father's substance abuse problem remains unresolved at this point. "'In parental rights matters, the court does not look to the protestations of affections and expressed intentions of the parent, but rather the parent's course of conduct.'" *In re Weston T.R.*, No. M2012-00580-COA-R3-PT, 2012 WL 3804414, at *7 (Tenn. Ct. App. Aug. 31, 2012) (quoting *Tenn. Dep't of Children's Servs. v. J.M.F.*, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005)). The focus of the persistent conditions ground is "on the *results* of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005) (emphasis added). Father's actions have not yet evidenced that he has overcome his problem with substance abuse. Moreover, Father admitted his own subjective concern that he would not be able to comply with the conditions of parole if he was released. This admission undermines his stated belief that things will be different this time around.

We also agree with the trial court's conclusion that there are several other conditions that are unlikely to be remedied at an early date so that Grace can be safely returned to Father in the near future. These include his remaining period of incarceration and his lack of prospects for employment and stable housing.

In sum, we find ample clear and convincing evidence that Father's substance abuse, and "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to [Father]," still persist; there is little likelihood that these conditions will be remedied at an early date so that Grace can be safely returned to Father in the near future; and the continuation of the parent-child relationship greatly diminishes Grace's chances of early integration into a safe, stable and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3). Because grounds for termination have been established, we consider Father's argument regarding the child's best interest.

### B. Best Interest

Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive. In addition, "the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest." *In re Arteria H.*, 326 S.W.3d 167, 182 (Tenn. Ct. App. 2010). The best interest of a child must be determined from the child's perspective and not the parent's. *Id.* (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-101(d)). Like the trial court, we find that the evidence clearly and convincingly establishes that it is in Grace's best interest for Father's parental rights to be terminated. By the time of trial, Grace was five years old and attending kindergarten. She had been in the custody of the Grandparents since the age of one. Grandmother testified that before Grace was removed from her parents' custody, she stayed sick "all the time" due to mold and mildew in her parents' trailer. She testified that Grace developed a severe staph infection and had to be transported to Vanderbilt to "physically have it cut out." Grandmother testified that Grace continues to require medication to guard against another staph infection. Grandmother testified that when Father was not incarcerated, he continued to live at the same trailer park with "deplorable" conditions, or at a local hotel, or with a friend. She said Grace was doing "amazingly well" in kindergarten at the time of trial, and she had her own room at Grandparents' house with "everything a little girl could want."

Grandmother testified that the main reason she filed the petition to terminate Father's parental rights was to benefit Grace's "future." Step-grandfather is a disabled veteran, and as a result, Grace will become eligible for many financial benefits if she is adopted and becomes his dependent. According to Grandmother's testimony, Grace is currently enrolled in TennCare because she is "under [the] State," but if the Grandparents adopt her, she can be added to their insurance policy. Grace would also be eligible to receive a dependent child benefit from the Veteran's Association and Social Security. Grandmother testified that if anything were to happen to Step-grandfather, Grace would be eligible to receive benefits as his dependent. Without these benefits, it would be difficult for Grandmother to financially provide for Grace by herself. Grandmother testified that Father had never had stable income or insurance. Step-grandfather similarly testified that his primary motive was "to adopt [Grace] and make sure that she is taken care of." He testified that he receives disability benefits from the Veteran's Association and Social Security and explained that Grace would be eligible for insurance benefits, dependent child benefits, and educational benefits if she is adopted. Step-grandfather said he wanted to be sure that Grace was "financially secure" if something happened to him, and he did not feel that he could depend on Father to be responsible for her financial support.

On appeal, Father argues that the trial court's best interest analysis failed to adequately consider ways in which the Grandparents failed in raising Father. He argues that it is not in Grace's best interest to terminate his parental rights because the Grandparents are "questionable as adoptive parents." However, at trial, Father was specifically asked whether he had any problem with the care that the Grandparents were providing to Grace, and he responded, "No I don't. They take great care of my daughter. That's never been an issue." Later in the proceedings, he was asked whether Grandmother was "doing a fine job" raising Grace, and he again said that the Grandparents "take great care of my child" and that their care for her had "never been an issue." There was no evidence that the alleged mistakes Grandmother made in raising Father twenty years ago have been repeated with Grace.

From our review of the record, the statutory best interest factors weigh heavily in favor of terminating Father's parental rights. Father has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home. Instead, he allowed Grace to remain in the Grandparents' home for over three years, becoming accustomed to their parenting style and physical environment, while he made little effort to alter his lifestyle or become a fit parent. He has no suitable home for a child. He was significantly behind in his child support. He has maintained only minimal contact with the child, exercising only "day-time" visitation a couple of times per month. Father has been unable to overcome his issues with criminal activity, alcohol abuse and drug use, and he admitted at trial that he did not know whether his anger and depression had caused him to try to kill himself during his last drinking episode.

For all of these reasons, we affirm the trial court's finding that termination of Father's parental rights is in Grace's best interest.

### C. Bifurcation

Finally, we consider Father's assertion that the trial court committed a procedural error by denying his attorney's oral request, at the beginning of trial, to bifurcate the hearing to determine grounds for termination before considering the issue of best interest.

We have previously noted that the statutory scheme governing termination proceedings does not require bifurcated proceedings. *In re Adoption of A.M.H.*, No. W2004-01225-COA-R3-PT, 2005 WL 3132353, at *42-43 (Tenn. Ct. App. Nov. 23, 2005) *rev'd on other grounds,* 215 S.W.3d 793 (Tenn. 2007). Some parental termination proceedings have been bifurcated in the manner advocated by Father. *See, e.g.*, *In re Dylan M. J.*, No. M2010-01867-COA-R3-PT, 2011 WL 941404, at *3 (Tenn. Ct. App. Mar. 17, 2011) ("The trial was bifurcated, with evidence as to grounds for termination heard first, followed by evidence as to the best interest of the child."); *In re Keri C.*, 384 S.W.3d 731, 737 (Tenn. Ct. App. 2010)

-12-

("The trial court decided to bifurcate the trial[.] The initial proceeding would be on grounds for termination of Mother's parental rights. If needed, a second hearing on the child's best interest would be conducted."); *In re S.L.D.*, No. E2005-01330-COA-R3-PT, 2006 WL 1085545, at *1 (Tenn. Ct. App. Apr. 26, 2006) ("By agreement of the parties, the issues of whether grounds existed for termination of parental rights and whether termination was in the child's best interest were bifurcated[.]"). However, it appears that the majority of parental termination cases are not bifurcated in such a manner. *See, e.g.*, *In re J.R.P.*, No. M2012-02403-COA-R3-JV, 2013 WL 4477860, at *3 (Tenn. Ct. App. Aug. 19, 2013) ("The trial was not bifurcated, so the trial court heard evidence on grounds and best interest at once."); *In re Drako J.M.*, No. M2012-01404-COA-R3-PT, 2012 WL 6634335, at *3 (Tenn. Ct. App. Dec. 18, 2012) ("For the convenience of the witnesses, the court agreed to hear evidence relevant to grounds for termination and to the best interest of the children at the same time, rather than bifurcate the hearing."). In *In re Adoption of A.M.H.*, this Court held that a trial court did not err in denying a motion to bifurcate termination proceedings, due to the absence of a statute or case law requiring bifurcation. *In re Adoption of A.M.H.*, 2005 WL 3132353, at *42-43.

On appeal, Father concedes that bifurcation is not required in termination proceedings. However, he argues that it was a permissible option and an appropriate one in this case. Father argues that the "financial factors" in this case "cloud" the analysis of grounds for termination and that the trial court's decision was "driven by the financial possibilities." We respectfully disagree with this assertion. We find nothing in the record to suggest that the trial court was unable to decide the existence of grounds for termination separate and apart from the best interest analysis. In our view, the trial court's opinion was thorough and well reasoned, and it gave appropriate consideration, not undue emphasis, to the legitimate issues surrounding Grace's financial security.

We review a trial court's decision on bifurcation for abuse of discretion. *Schutt v. Miller*, No. W2010-02313-COA-R3-CV, 2012 WL 4497813, at *9 n.13 (Tenn. Ct. App. Sept. 27, 2012). The trial judge denied Father's request for bifurcation, stating that "a lot of that proof is going to be overlapping" and that he did not want to "hear things twice."[4] We cannot say that the trial court abused its discretion in this decision.

---

[4]The trial court's concern about overlapping evidence was justified. For example, the ground of persistent conditions requires the court to consider whether conditions persist that would cause the child to be subject to abuse or neglect and prevent the child's return to the home, Tenn. Code Ann. § 36-1-113(g)(3)(A), and the best interest analysis requires consideration of whether the parent has made an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home. Tenn. Code Ann. § 36-1-113(i)(1).

## V. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby affirmed and remanded. Costs of this appeal are taxed to the appellant, Roy Y. Because Roy Y. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

 

_____
BRANDON O. GIBSON, JUDGE